Elizabeth **LUESSENHOP** and Mark Baechle, Plaintiffs–Counter–Defendants–Appellants,

Alexander Tupaz, Lourdes Tupaz, and Martin Bouchard, Plaintiffs–Appellants,

v.

**CLINTON COUNTY, NEW YORK,** William Bingel, in his individual capacity and in his official capacity as Clinton County Administrator, Janet L. Duprey, in her individual capacity and in her official capacity as Clinton County Treasurer, and Charles Johnson, Jr., Defendants–Counter–Claimants–Appellees,

**Town of Mendon, Defendant–Cross–Defendant–Appellee.**

**Docket Nos. 05–4083–cv (L); 06–0093–cv (CON); 06–0704–cv (CON); 06–2180–cv (CON).**

United States Court of Appeals, Second Circuit.

Argued Aug. 11, 2006.

Decided Oct. 11, 2006.

Shannon A. Bertrand, Rutland, VT (Kenlan, Schwiebert & Facey, Rutland,

VT, of counsel), for Plaintiff–Counter–Defendant–Appellant Mark Baechle.

Mark Schneider, Plattsburgh, NY, for Plaintiffs–Appellants Elizabeth Luessenhop, Alexander Tupaz, Lourdes Tupaz and Martin Bouchard.

Robert A. Rausch, Albany, N.Y. (Maynard, O'Connor, Smith & Catalinotto, Albany, NY, of counsel), for Defendants–Claimants–Appellees.

Philip C. Woodward, South Burlington, VT (Marikate E. Kelley, Woodward & Kelley, South Burlington, VT, of counsel), for Defendant–Cross–Defendant–Appellee.

Marc D. Craw, Colonie, NY, for Amicus Curiae Assemblyman Ortloff.

Michael T. Kirkpatrick, Deepak Gupta, Public Citizen Litigation Group, Washington, D.C., for Amicus Curiae Public Citizen, Inc.

Before: MESKILL, CALABRESI, and POOLER, Circuit Judges.

MESKILL, Circuit Judge:

These consolidated appeals raise two issues. First, whether federal courts, consistent with the Tax Injunction Act, 28 U.S.C. § 1341 (2006), have jurisdiction to adjudicate a taxpayer's challenge that the notice of foreclosure provided by the taxing authority of a state is constitutionally inadequate. We conclude that the district courts have jurisdiction. Second, whether the taxpayers in this consolidated appeal were provided with constitutionally adequate notice. Because three of the four lower court judgments dismissed the taxpayers' actions on jurisdictional grounds, we remand those cases for consideration of the merits consistent with the Supreme Court's recent decision in *Jones v. Flowers*, —— U.S. ——, 126 S.Ct. 1708, 164 L.Ed.2d 415 (2006). The sole case to resolve the dispute on non-jurisdictional grounds is reversed and remanded for proceedings consistent with this opinion.

## I.

These appeals involve three cases arising in Clinton County, the northeasternmost county of upstate New York, and one case arising from Mendon, Vermont, a central Vermont town. Each plaintiff owned real property and was delinquent in paying property taxes. In response, the taxing authorities initiated foreclosure proceedings. Ultimately, the local governments intended to sell (and, in at least one case, did in fact sell) the taxpayers' property at a public sale to satisfy the unpaid property taxes.

None of the plaintiffs disputes the authority of the governmental body to collect the taxes due on the real property in question. Neither do they contest the assessments of their property, or the amount of taxes claimed due. Instead, plaintiffs assert that the local taxing authorities failed to notify them adequately of the pending foreclosure and subsequent public sale of their property.[1] Plaintiffs complain that it is fundamentally unfair, and a violation of their due process rights enumerated in the Fourteenth Amendment, for the government to take their property without adequate notification.

*Elizabeth Luessenhop*

Elizabeth Luessenhop (Luessenhop) was the owner of two parcels of land located in the Village of Champlain, Clinton County, New York (the County). Her permanent address was 2944 Upton Street, N.W., Washington, D.C. At times during 2002, however, she temporarily lived in London, England. In the early 1990s, Luessenhop

---

1. The Tupazes also challenge the constitutionality of New York Real Property Tax Law § 1131, insofar as it does not mandate service of the default judgment of tax foreclosure.

frequently did not timely pay her property taxes. However, when the County would send her a final redemption notice, it was her practice to pay a sufficient amount of the back taxes to avoid losing title to her property. In the early 21st century, Luessenhop fell behind on her taxes once again. As a result, on January 17, 2002, the County sent a Notice of Arrears to Luessenhop's D.C. address, via regular mail, informing her that "[t]axes from one or more prior levies remain due and owing." Luessenhop did not fulfill her full tax obligation in response to this notice. Then, on October 4, 2002, the County sent Luessenhop a Notice of Foreclosure, by certified mail, explaining that due to her failure to satisfy her property tax debt, foreclosure proceedings had begun, and to avoid loss of ownership Luessenhop must pay her taxes or respond prior to January 17, 2003. Additionally, the County posted a notice in the Clinton County Courthouse, and published a notice in two Clinton County newspapers once a week for three non-consecutive weeks. The Notice of Foreclosure sent on October 4, 2002 was returned to the County as "unclaimed," "which for purposes of the Postal Service means that the 'addressee abandoned or failed to call for the mail.'" *Harner v. County of Tioga*, 5 N.Y.3d 136, 140–41, 800 N.Y.S.2d 112, 115, 833 N.E.2d 255 (2005) (alterations omitted) (quoting United States Postal Service Domestic Mail Manual part 507, Ex. 1.4.1 *available at* http://pe.usps.gov/ text/dmm300/ 507.htm). When the mailing was returned as "unclaimed," the County's staff checked the tax rolls and confirmed that the Upton Street address was correct. The County undertook no further efforts to contact Luessenhop.

Following Luessenhop's inaction, an order of default was signed on March 20, 2003 and entered on April 1, 2003, immediately transferring title of Luessenhop's property to the County. On or about May 16, 2003, Luessenhop offered to pay her tax debt but the County refused to accept the payment, explaining that January 17th was the final day of redemption.

Luessenhop moved to vacate the default judgment in Clinton County Supreme Court. Her motion was denied. *See Luessenhop v. Clinton County*, 378 F.Supp.2d 63, 66(N.D.N.Y.2005). The denial was affirmed by the Appellate Division and the Court of Appeals denied leave to appeal. *Id.* at 66 n. 8. Luessenhop then filed suit in the United States District Court for the Northern District of New York seeking, *inter alia*, an injunction preventing the County from auctioning her property, as well as actual and punitive damages. The district court found that the County's attempted notification was constitutionally adequate and it granted summary judgment for the County. *Id.* at 67–73. Luessenhop filed this timely appeal. The County agreed not to sell Luessenhop's property pending the conclusion of this action. *See id.* at 66.

*Mark Baechle*

Plaintiff Mark Baechle (Baechle) was the owner of a condominium in Mendon, Vermont (Mendon). He purchased the condominium in 1993, at which time his primary residence was 3050 South Drive, Allentown, Pennsylvania. In 1999, he moved to 4170 Ascot Circle in Allentown. He received a property tax bill from Mendon at his new address in 2000, and timely remitted payment. Unfortunately, Baechle's tax bills for 2001, 2002, and 2003 were sent to his former address and were not forwarded to 4170 Ascot Circle. These bills were returned to Mendon as undeliverable, and Baechle did not make any property tax payments for these three years.

In response to Baechle's delinquency, Mendon foreclosed and conducted a public

tax sale to recoup the back taxes. Mendon's attempt to inform Baechle that he was soon to be relieved of ownership of his condominium was unavailing; the notices of the tax sale were sent to the 3050 South Drive address, and all were returned to Mendon as undeliverable.[2] On March 31, 2004, Mendon sold Baechle's condominium to Mr. Charles Johnson.

Baechle learned of the sale to Mr. Johnson some time in 2005 and filed an action in the United States District Court for the District of Vermont seeking a declaration that the tax collector's deed given to Mr. Charles Johnson is null and void, as well as actual and punitive damages. Mendon moved to dismiss for lack of subject matter jurisdiction, relying on the Tax Injunction Act, 28 U.S.C. § 1341. The district court granted the motion and dismissed Baechle's claims.

*Alexander and Lourdes Tupaz*

The Tupazes are residents of Staten Island, New York who own two contiguous undeveloped parcels of land in the town of Plattsburgh, Clinton County, New York. The Tupazes fell behind in their tax payments for the year 2002 and the County allegedly sent the Tupazes numerous letters, throughout 2002 and the beginning of 2003, informing them that failure to pay back taxes would result in foreclosure. The letters were sent, via first-class mail, to 4675 Amboy Road, Staten Island, the address listed on the town tax rolls. The letters were not returned as undeliverable, but the Tupazes did not respond. On February 11, 2003, the County's letter advised the Tupazes that if their taxes remained unpaid on October 10, 2003, a foreclosure action would be commenced. The Tupazes did not respond.

On October 10, 2003, the County sent Notices and Petitions of Foreclosure to all delinquent taxpayers, including the Tupazes, via certified mail, and published a notice in two local newspapers. These notices were intended to inform the Tupazes that the final date for redemption was January 16, 2004. Again, the Tupazes did not respond, prompting the County to proceed with the foreclosure.

The parties dispute whether the Notice of Foreclosure sent by certified mail actually was received. The County submitted a print-out from the United States Postal Service website confirming that the letter was delivered at 2:46 p.m. on October 16, 2003, and that a "line" was drawn through the signature section of the green certified mail receipt. The Tupazes claim that it was impossible for anyone at the Staten Island residence to have accepted the County's letter on October 16, 2003: the Tupazes were both working in Brooklyn that day and their adult son was away at Iona College in New Rochelle, NY. They further point out that the "line" drawn through the signature box of the return receipt is evidence that no one received the item of certified mail. The ramifications of this dispute will be discussed in Part III.

On February 20, 2004, title was transferred to the County. The Tupazes' motion to vacate the foreclosure in state court

---

**2.** It is unclear whether Mendon sent notices to Baechle by first-class mail or certified mail. Baechle's complaint does not specify, and the district court's opinion is facially inconsistent. The court's opinion explains that Mendon's documents indicate that a formal notice of the tax sale was sent via certified mail at the beginning of February 2004, but the court also notes that the USPS returned these letters as undeliverable. *Baechle v. Town of Mendon*, No. 1:05–cv–204, 2005 WL 3334708, at *1 nn.1–2 (N.D.N.Y. Dec. 8, 2005). This is inconsistent because if certified letters do not reach their intended recipient, they are returned as "unclaimed" not "undeliverable." This uncertainty will be explored further in Part III.

was denied as untimely and the denial was affirmed by the Appellate Division. *In re Foreclosure of Tax Liens by County of Clinton,* 17 A.D.3d 914, 793 N.Y.S.2d 596 (3d Dep't 2005). The Tupazes then commenced an action in the United States District Court for the Northern District of New York. The Tupazes' complaint sought, *inter alia,* a declaration that the County's notice was constitutionally inadequate, a demand for injunctive relief preventing the County from selling their property, and both actual and punitive damages.

The parties cross-moved for summary judgment and the district court granted the County's motion on two grounds. First, the court, *sua sponte,* concluded that the Tax Injunction Act applied and, consistent with that Act, the court declined to exercise jurisdiction over the Tupazes' constitutional challenge. Second, the court held that even if it did have jurisdiction, the County's attempt to notify the Tupazes "passe[d] constitutional muster." Judgment was then entered for the County.

*Martin Bouchard*

Martin Bouchard (Bouchard) also brought a suit against Clinton County in the Northern District of New York alleging that the County's failure to provide adequate notice before foreclosing on his property for failure to pay back taxes violated due process. The district court dismissed the suit for lack of jurisdiction under the TIA. In June 2006, after this appeal had been filed, Bouchard and the County stipulated to dismiss the claim for injunctive relief. The County agreed to reconvey Bouchard's property in return for full payment of unpaid property taxes. Bouchard's claims for damages and declaratory relief remain.[3] Pursuant to the partial settlement agreement, neither par-

ty has briefed nor argued their case before this Court and the parties have stipulated that the determination of the TIA issue in the other three appeals will also be appropriate in their case. Under these circumstances, in considering the instant consolidated appeals we do not rely on the specific facts of *Bouchard.*

By orders of this Court, these four separate cases were consolidated into a single appeal.

## II.

■ The threshold issue to be addressed in this consolidated appeal is jurisdictional: does the Tax Injunction Act ("TIA" or "Act"), 28 U.S.C. § 1341, preclude the federal courts from asserting jurisdiction. The TIA is a concise statute. It declares that "[t]he district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." *Id.* The plaintiffs challenge the adequacy of the notice provided by Clinton County and the Town of Mendon. Plaintiffs' initial hurdle is whether they may avail themselves of a federal forum to adjudicate this constitutional question. We conclude that they may.

Three of the four district court judgments dismissed plaintiffs' claims for lack of subject matter jurisdiction, relying on the TIA. We review *de novo* the district courts' dismissal for lack of subject matter jurisdiction. *See Celestine v. Mount Vernon Neighborhood Health Ctr.,* 403 F.3d 76, 79–80 (2d Cir.2005).

The TIA is capable of multiple interpretations. Over thirty years ago, we noted

---

**3.** Bouchard's complaint also challenges the constitutionality of New York Real Property

Tax Law §§ 1125 & 1131.

that a plausible interpretation of the term "collection" was "anything that a state has determined to be a likely method of securing payment." *Wells v. Malloy*, 510 F.2d 74, 77 (2d Cir.1975). Then, after considering "[t]he context and the legislative history [of the TIA]," we rejected this broad reading. *Id.* We concluded that Congress, in enacting the TIA, "was thinking of cases where taxpayers were repeatedly using the federal courts to raise questions of state or federal law going to the validity of the particular taxes imposed upon them." *Id.* Thus, the taxpayer's challenge in *Wells*—whether a Vermont law suspending a taxpayer's license for failure to pay a vehicle tax was consistent with the Equal Protection Clause of the Fourteenth Amendment—was properly adjudicated in a federal forum. *Id.* at 76–77. Vermont's coercive measure did not implicate the TIA because the taxpayer did not dispute that the tax was due.

We again rejected a broad reading of the TIA in *Mobil Oil Corp. v. Tully*, 639 F.2d 912 (2d Cir.1981) There, we refused to apply the TIA to a challenge brought against the anti-passthrough provision of an oil tax law, notwithstanding that the oil company's challenge was, at a minimum, related to state tax administration. Relying on *Wells*, we explained that "[t]he mere fact that the anti-passthrough section is contained in a tax law of the State

should not lead to automatic sanctuary under Section 1341." *Id.* at 918.

Recently, the Supreme Court has had occasion to consider the breadth of the TIA. Analyzing the same sources that animated our opinion in *Wells*, the Court concluded that "[n]owhere does the legislative history announce a sweeping congressional direction to prevent federal-court interference with all aspects of state tax administration." *Hibbs v. Winn*, 542 U.S. 88, 105, 124 S.Ct. 2276, 159 L.Ed.2d 172 (2004) (internal quotation marks omitted). Mirroring the conclusion reached in *Wells*, the Court summarized the purpose of the TIA: "In short, in enacting the TIA, Congress trained its attention on taxpayers who sought to avoid paying their tax bill by pursuing a challenge route other than the one specified by the taxing authority." *Id.* at 104–05.[4]

As these cases indicate, when we consider the applicability of the TIA to the causes of action brought by the plaintiffs in the instant appeals, we are not writing on a blank page. At a minimum, *Wells*, *Mobil Oil* and *Hibbs* unambiguously hold that summarily dismissing plaintiffs' causes of action because they pertain to state tax administration in the most general sense would be a patent misreading of the TIA.

---

**4.** One circuit, in dicta, has read it pretty much as we do here. *ACLU of Tenn. v. Bredesen*, 441 F.3d 370, 373 n. 1 (6th Cir.2006) (noting that it is "at least questionable whether the TIA would apply" when plaintiffs are "not seeking to avoid payment" of a tax.). Two have interpreted it in a similar, but slightly different way. *May Trucking Co. v. Or. DOT*, 388 F.3d 1261, 1267 (9th Cir.2004) (After *Hibbs*, the dispositive question in determining whether the Acts jurisdictional bar applies is whether "federal-court relief ... would have operated to reduce the flow of state tax revenue."); *Okla. ex rel. Okla. Tax Comm'n v. Int'l Registration Plan*, 2006

U.S.App. LEXIS 18589, 11–12 (10th Cir.2006) ("To determine whether the TIA applies, however, this court must decide whether the relief sought by Oklahoma would reduce the flow of state tax revenue for purposes of the TIA."). And one circuit has interpreted *Hibbs* more narrowly. *Henderson v. Richard Stalder*, 407 F.3d 351, 359 (5th Cir.2005) (holding that *Hibbs* "opened the federal courthouse doors slightly notwithstanding the limits of the TIA, but ... only where (1) a third party (not the taxpayer) files suit, and (2) the suit's success will enrich, not deplete, the government entity's coffers").

In the instant appeals, plaintiffs' complaints are grounded in the means employed by the local governments to inform individuals that, due to their tax delinquency, title to their property will be transferred to the sovereign and sold at a public auction. Although the TIA has been interpreted to cover local taxes, *see generally* 17 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 4237 (2d ed.1988), *Wells* and *Hibbs* suggest that the challenges here do not trigger the TIA because the taxpayers are not seeking to utilize federal courts as a conduit to empty state coffers. *See Hibbs,* 542 U.S. at 107, 124 S.Ct. 2276 ("[The Supreme] Court has interpreted and applied the TIA only in cases Congress wrote the Act to address, *i.e.,* cases in which state taxpayers seek federal-court orders enabling them to avoid paying state taxes."); *Wells,* 510 F.2d at 77 ("[In enacting the TIA] Congress was thinking of cases where taxpayers were repeatedly using the federal courts to raise questions of state or federal law going to the validity of the particular taxes imposed upon them."). *Hibbs* and *Wells* explain that Congress' intent in enacting the TIA was the prevention of a particular evil; namely, using federal courts as a vehicle to bring suits challenging the validity or amount of a particular tax assessed against an individual person or entity.

For example, *Wells* found the Senate Judiciary Committee's Report to be persuasive evidence that Congress was focusing on challenges "going to the validity of the particular taxes imposed upon" an individual or company. *Wells,* 510 F.2d at 77. In particular, Congress was concerned with a specific threat posed by foreign corporations:

> The existing practice of the Federal courts in entertaining tax-injunction suits against State officers makes it possible for foreign corporations doing business in such States to withhold from them and their governmental subdivisions, taxes in such vast amounts and for such long periods of time as to seriously disrupt State and county finances. The pressing needs of these States for this tax money is so great that in many instances they have been compelled to compromise these suits, as a result of which substantial portions of the tax have been lost to the States without a judicial examination into the real merits of the controversy.

*See id.* at 77 n. 5 (quoting S.Rep. No. 75–1035, at 2 (1937)). The Supreme Court's review of the legislative history arrived at the same conclusion.

Considering the Senate's Report, *Hibbs* explained that the TIA was enacted to achieve two closely related, state-revenue-protective objectives:

> (1) to eliminate disparities between taxpayers who could seek injunctive relief in federal court—usually out-of-state corporations asserting diversity jurisdiction—and taxpayers with recourse only to state courts, which generally required taxpayers to pay first and litigate later; and (2) to stop taxpayers, with the aid of a federal injunction, from withholding large sums, thereby disrupting state government finances.

*Hibbs,* 542 U.S. at 104, 124 S.Ct. 2276 (citing S.Rep. No. 75–1035, at 1–2 (1937)). Because the TIA was enacted to combat specific evils, the Supreme Court could not accept petitioner's broad proposition that "the TIA totally immunizes from lower federal-court review all aspects of state tax administration." *Id.* at 105, 124 S.Ct. 2276 (internal quotation marks omitted). Rather, because "Congress trained its attention on taxpayers who sought to avoid paying their tax bill by pursuing a challenge route other than the one specified by the taxing

authority," *id.* at 105, 124 S.Ct. 2276, the TIA should be interpreted to preclude jurisdiction only where "state taxpayers seek federal-court *orders enabling them to avoid paying state taxes,*" *id.* at 107, 124 S.Ct. 2276 (emphasis added).

*Hibbs* also considered previous cases applying the TIA. In each case, the challenge was brought by "plaintiffs who mounted federal litigation to avoid paying state taxes (or to gain a refund of such taxes)." *Id.* at 106, 124 S.Ct. 2276. The TIA was appropriately interpreted to preclude the district courts from exercising jurisdiction in these instances because "[f]ederal-court relief ... would have operated to reduce the flow of state tax revenue." *Id.* at 106, 124 S.Ct. 2276. Thus, looking at the cases involving the TIA, the Court noted that its jurisprudence also was consistent with the TIA's legislative history.

Defendants contend that it is error to rely on *Hibbs.* In their briefs and at oral argument, they argue that the question presented to the Court in *Hibbs* was so different than the instant issue that we should not look to *Hibbs* for support. Although *Hibbs* did consider a different type of challenge to state tax administration, we do not agree that this distinction renders *Hibbs'* discussion of the purpose and thrust of the TIA irrelevant.[5]

*Hibbs* was a third-party taxpayer suit. In *Hibbs,* the plaintiff-taxpayers sought to enjoin Arizona from offering a tax credit to individuals who donated to a "school tuition organization" (STO), an undertaking that directed scholarship grants to students enrolled in private elementary or secondary schools. *Id.* at 95, 124 S.Ct. 2276. The taxpayers brought suit under 42 U.S.C. § 1983, alleging that Arizona's tax credit scheme was incompatible with the Establishment Clause of the First Amendment because the STOs were permitted to direct money to private schools that "provide religious instruction or that give admissions preference[s] on the basis of religion or religious affiliation." *Id.* Indeed, other than the commonality of the ubiquitous section 1983, the instant appeal could not be more divergent from the question presented in *Hibbs.* But it does not follow that these differences counsel against following *Hibbs'* discussion of congressional intent.

The Supreme Court's evaluation of the TIA's legislative history and its effect on the proper interpretation of this ambiguous statute is controlling on inferior courts notwithstanding the significant distinguishing characteristics of the two cases. *See, e.g., Allegheny County Sanitary Auth. v. Envt'l Prot. Agency,* 732 F.2d 1167, 1174–76 (3d Cir.1984). The defendants' argument would be more forceful if we applied *Hibbs'* holding to the instant appeal by simple analogy, *i.e.,* because the TIA was not applicable in that case, it does not apply here. Defendants' argument falters

---

5. It is worthwhile to mention that there is at least one similarity between *Hibbs* and the instant appeal. In *Hibbs,* the Court noted that "[i]n decisions spanning a near half century, courts in the federal system, including this Court, have entertained challenges to tax credits authorized by state law, without conceiving of § 1341 as a jurisdictional barrier." 542 U.S. at 93, 124 S.Ct. 2276. Likewise, our cases considering the constitutionality of the notice provided to taxpayers prior to foreclosure and subsequent sale have not been stymied by § 1341's jurisdictional bar. *See,*

*e.g., Akey v. Clinton County,* 375 F.3d 231 (2d Cir.2004); *Weigner v. City of New York,* 852 F.2d 646 (2d. Cir.1988). The majority opinion in *Hibbs* concluded by declaring that "[c]onsistent with the decades-long understanding prevailing on this issue [of establishment clause challenges to state taxes], respondents' suit may proceed without any TIA impediment." *Hibbs,* 542 U.S. at 112, 124 S.Ct. 2276. We reach the same conclusion regarding constitutional challenges to inadequate notice.

because the Supreme Court's discussion of the proper interpretation in *Hibbs* transcends that individual case and is properly construed by the circuits as a definitive ruling on the proper interpretation of the TIA. *See Pierce v. Underwood,* 487 U.S. 552, 566, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988) ("[I]t is the function of the courts and not the Legislature ... to say what an enacted statute means."). The reasoning of *Hibbs* guides our interpretation of the TIA.

We note that a similar argument could be presented urging us not to adhere to our interpretation of the TIA in *Wells.* The taxpayer's challenge in *Wells,* although perhaps more analogous because it was not a "third party" suit, was also different than the instant appeal. In *Wells,* the taxpayer challenged a coercive sanction levied by Vermont; a device the state determined would be likely to induce taxpayers to fulfill their obligations. *Wells* was a challenge to the method of collection. In the instant appeal, the taxpayers are not objecting to the method utilized by the local governments—they do not dispute that foreclosures and subsequent public sales are a legitimate method of recouping overdue property taxes. Instead, the taxpayers here object to the procedures used to accomplish this particular method of satisfaction. In contrast, the taxpayer in *Wells* contested the state's chosen method of collection itself. Notwithstanding the differences between these two cases, we deem *Wells'* discussion of the TIA's purpose and scope to be instructive.

We hold that the TIA does not bar the district courts from adjudicating the merits of these cases. In the instant appeal the taxpayers are not attempting to avoid paying state taxes. They are willing to pay the full amount of their property taxes, both current and back. Likewise, the taxpayers do not contest the government's authority to collect property taxes, nor do they dispute the assessments or amounts owed. Therefore, these cases do not raise the specter of federal courts reducing the flow of money into state coffers—the evil that the TIA was intended to eradicate.

## III.

Having determined that the TIA does not deprive the federal courts of subject matter jurisdiction, we now turn to the circumstances of each individual case.

We review *de novo* a district court's granting of summary judgment and motion to dismiss for lack of jurisdiction. *Palmieri v. Allstate Ins. Co.,* 445 F.3d 179, 184 (2d Cir.2006); *Rubens v. Mason,* 387 F.3d 183, 188 (2d Cir.2004). Subsequent to the district courts' decisions in these four cases, the Supreme Court decided *Jones v. Flowers,* —— U.S. ——, 126 S.Ct. 1708, 164 L.Ed.2d 415 (2006), a case that is directly on point and untainted by any jurisdictional quandaries, having arisen in state court.

In *Jones,* the taxpayer (Jones) failed to pay his property taxes for the years 1997, 1998, and 1999. In April 2000, the Arkansas Commissioner of State Lands (Commissioner) mailed a certified letter to Jones notifying him of his delinquency, his right to redeem the property, and warning him that failure to take action would result in a loss of his property rights. *Id.* at 1712. The postal service returned the letter to the Commissioner as "unclaimed." *Id.*

Two years later, a third-party, Ms. Linda Flowers (Flowers), submitted an offer for Jones' property. The Commissioner sent one final certified letter to Jones informing him that his property was about to be sold. *Id.* This letter was also returned as "unclaimed." *Id.* at 1712–13. Flowers then purchased Jones' house and

had an unlawful detainer notice delivered to the property. *Id.* at 1713. The notice was served on Jones' daughter, who notified Jones that the house had been sold at a tax sale. *Id.*

Jones filed suit in state court against Flowers and the Commissioner, challenging the Commissioner's taking of his property. He alleged that the Commissioner's failure to notify him of the tax foreclosure and sale resulted in the taking of his property without due process of law, in violation of the Fourteenth Amendment. The trial court granted summary judgment in favor of the Commissioner and Flowers, holding that the notice "complied with constitutional due process requirements." *Id.* The Arkansas Supreme Court affirmed, but the United States Supreme Court reversed, holding that the Commissioner's attempted notice was constitutionally inadequate. *Id.*

The Court's opinion harkened back to the fifty-six year old landmark case of *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950). In *Mullane*, Justice Jackson reiterated the familiar maxim that "[t]he fundamental requisite of due process of law is the opportunity to be heard," but added that "[t]his right to be heard has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to appear or default, acquiesce or contest." *Id.* at 314, 70 S.Ct. 652. (internal quotation marks omitted). *Mullane* did not go so far as to hold that due process "require[s] that a property owner receive *actual notice* before the government may take his property," *Jones*, 126 S.Ct. at 1713 (citing *Dusenbery v. United States*, 534 U.S. 161, 170, 122 S.Ct. 694, 151 L.Ed.2d 597 (2002)) (emphasis added), but it did require the government to provide "notice reasonably calculated, under all the cir-

cumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane*, 339 U.S. at 314, 70 S.Ct. 652. Moreover, this requirement of "notice reasonably calculated" must be made in good faith, for, as Justice Jackson noted, "when notice is a person's due, process which is a mere gesture is not due process." *See id.* at 315, 70 S.Ct. 652. The government fulfills its obligation to make a good faith attempt to inform interested parties as long as "[t]he means employed [are] . . . such as one *desirous* of actually informing the absentee might reasonably adopt to accomplish it." *Id.*

In *Jones*, the Court found that the Commissioner did not meet his good faith obligation. *See id.* at 1718 ("In response to the returned form suggesting that Jones had not received notice that he was about to lose his property, the State did—nothing."). It was clear to the Court that "a person who actually desired to inform a real property owner of an impending tax sale of a house he owns would [not] do nothing when a certified letter sent to the owner is returned unclaimed." *Id.* at 1716. Thus, the Commissioner's inaction offended an integral component of the Fourteenth Amendment's due process requirement: failure to notify an interested party. *See Joint Anti–Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 171–72, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring) ("No better instrument has been devised for arriving at truth than to give a person in jeopardy of serious loss notice of the case against him and opportunity to meet it. Nor has a better way been found for generating the feeling, so important to a popular government, that justice has been done.").

The Court concluded that the Commissioner should have taken additional reasonable measures to notify Jones. This,

however, was merely the first step. "The question remain[ed] whether there were any such available steps," because "if there were no reasonable additional steps ... [the state] cannot be faulted for doing nothing." *Jones,* 126 S.Ct. at 1718. The Court answered this question in the affirmative, looking at "what the new information [*i.e.,* return of the unclaimed letter] reveal[ed]." *Id.*

In Jones' case, the Court explained that there were at least two possible steps the Commissioner could have pursued, both of which are relevant for the four cases consolidated into this single appeal. First, the government could have (and should have) sent the notice by regular mail. *Id.* at 1718–19; *see also Harner,* 5 N.Y.3d at 138, 800 N.Y.S.2d at 113, 833 N.E.2d 255 ("[D]ue process was satisfied in this case where the notices of foreclosure sent by certified mail ... were returned 'unclaimed,' but the ordinary mailings were not, and the County took no steps to obtain an alternative address."). Second, the Commissioner could have posted a notice on the front door of Jones' property. *Jones,* 126 S.Ct. at 1719. The state was not, however, required to search for the taxpayer's new address in the Little Rock phonebook or other government records such as income tax rolls. *Id.*

As the foregoing discussion conveys, *Jones* set forth—in a very straightforward fashion, bereft of the technical jargon that lay persons deride—the government's obligations prior to taking a taxpayer's property. Our role is to apply *Jones* to the facts of each case in this consolidated appeal.

*Luessenhop*

■ Luessenhop's case is similar to the actual facts of *Jones.* In both cases the government sent the taxpayer a notice of foreclosure via certified mail. In both cases the item was returned as "unclaimed," and in both cases the government took no further action other than posting the notice in a newspaper.[6] *Jones* held that this inaction renders the attempted notice constitutionally deficient, as long as additional steps are practicable. In Luessenhop's case, it would not have been a terrible burden for the County to take at least one of the steps suggested in *Jones; viz.,* sending a first-class letter to Luessenhop's Washington, D.C. address. Accordingly, the County's effort to provide notice to Luessenhop was insufficient to satisfy due process. As such, the judgment of the district court is reversed and the case is remanded for proceedings consistent with this opinion.

*Baechle*

This case was dismissed on jurisdictional grounds by the district court at the pleading stage. Having determined that the district court should have exercised jurisdiction, we vacate the district court's dismissal of Baechle's claims. Because this case was dismissed at such an early stage, it must be remanded to the district court for further proceedings consistent with this opinion.

---

**6.** In Luessenhop's case the County posted a notice in the local courthouse as well, a step not taken by the Arkansas Commissioner in *Jones.* We do not believe this additional posting distinguishes these two cases. In *Jones,* the Court noted that publication in a newspaper was not a constitutionally adequate follow-up step because " 'chance alone' brings a person's attention to 'an advertisement in small type inserted in the back pages of a newspaper.' " *Jones,* 126 S.Ct. at 1720 (quoting *Mullane,* 339 U.S. at 315, 70 S.Ct. 652). "Chance alone" is all that would cause an individual to appear at the courthouse and be apprised of the government's intentions concerning his land. Therefore, this additional measure does not save the County's constitutionally inadequate notification.

On remand, the district court should consider the following matters. First, the precise mechanism Mendon employed to contact Bouchard initially. Second, the record says nothing about what steps, if any, Mendon took to notify Baechle of the impending tax sale after Mendon was notified that Baechle did not receive the letters.

On remand, the district court should determine what, if anything, Mendon did to ascertain Baechle's correct address. Mendon proffers that it did, in fact, take some additional steps, but to no avail. If the court is satisfied that Mendon did make further attempts to find Baechle, it should assess the adequacy of those measures. Finally, the court should determine whether it was practicable for the government to have taken any additional steps to inform Baechle of the impending sale of his property. It is worth reiterating that although in *Jones* the Court found that there were minimally burdensome followup measures available to the state, the Court did predict that there may be some instances where "there were no reasonable additional steps the government could have taken upon return of the unclaimed notice letter," and in those situations the government could not "be faulted for doing nothing." *Id.* at 1718. When considering the availability of reasonable additional steps, the court should consider whether Baechle's suggestions of consultation with the Rutland Department of Public Works or the condominium owners' association are reasonable under *Jones*.

### Tupazes

This case presents the most difficult application of *Jones*. In this case, the County's initial letters informing the Tupazes of their delinquency were sent via first-class mail and were not returned as undeliverable. Thus, the County is entitled to presume that the Tupazes received those let-

ters. *See, e.g., Akey v. Clinton County,* 375 F.3d 231, 235 (2d Cir.2004). The mailing informing the Tupazes of the impending sale, however, was sent via certified mail. The parties dispute whether this mailing was received. The Tupazes claim that no one was at home to receive the item of certified mail and that the County cannot produce a signature on the return receipt. The County, however, did produce a "Track and Confirm" print-out from the postal service, indicating that the letter was in fact delivered at 2:46 on October 16, 2003.

■ On cross-motions for summary judgment, the district court, *sua sponte,* dismissed the Tupazes' suit for lack of jurisdiction under the Tax Injunction Act. The court also held that, "even if [it] did have subject matter jurisdiction," the County's attempt to notify the Tupazes satisfied due process. The district court explained that "in light of the numerous first class letters sent to plaintiffs' proper address regarding their tax deficiencies and indicating that the failure to pay taxes would result in foreclosure, none of which were returned as undeliverable, the notice of foreclosure that was sent by certified mail to plaintiffs' proper address and confirmed by the postal service to have been delivered, and the publication in the local newspaper, plaintiffs were not deprived of their property without due process of law." The court further noted that although "[p]laintiffs make much of the fact that the postal receipt contains a straight line through it or some otherwise unintelligible mark[,][t]he Court finds that fact to be irrelevant." We cannot agree with these conclusions for two reasons.

First, it is far from clear, under *Jones,* what weight should be given to their receipt of the first-class letters. It is at least arguable that if (i) the Tupazes did not receive the notice (sent by certified mail)

informing them that the government was about to take their property, (ii) the government was aware that the letter was not received, and (iii) the government took no additional steps where it was practicable to do so, then the notice fails under *Jones*. It will be for the district court, in the first instance, to determine whether *Jones* suggests that the government's failure to act is excused because prior letters presumably had reached their desired destination.

Second, the question that *Jones* tells us to ask is whether the County *thought* that the Tupazes had received notice. The record indicates that the County received conflicting information regarding the Tupazes' receipt of the notice: the postal service confirmed delivery, but there was no signature on the return receipt. The district court, having rendered decision prior to *Jones*, did not frame the question in this manner. It does appear that the court determined that the Tupazes must have received the letter, pointing out that "a certified letter that has been confirmed by the postal service to have been delivered to plaintiffs' proper address passes constitutional muster." But the court never made a specific finding regarding whether the County thought the Tupazes received the letter. This is a subtle but important distinction. Moreover, the question whether the County thought that the Tupazes had received the item of certified mail is a disputed question of fact, and each side should be permitted to marshal its evidence on this issue. Accordingly, the district court's decision dismissing the case is vacated and this case is remanded for further proceedings consistent with this opinion.

*Bouchard*

This case is similar to Luessenhop. The County sent a notice by certified mail and it was subsequently returned as unclaimed. On receipt of the unclaimed letter, the County made no further attempts to inform Bouchard. Under these facts, the County's attempted notice is constitutionally deficient under *Jones*.

Unlike *Luessenhop*, however, the proceedings below were terminated by a motion to dismiss for lack of subject matter jurisdiction. As such, the County has not been provided an opportunity to prove either that (1) it reasonably believed that Bouchard did receive the Notice, or that (2) it took reasonable steps to inform Bouchard of the foreclosure after realizing that Bouchard was not notified. The County must be given an opportunity to prove its case. Accordingly, the district court's judgment is vacated and this case is remanded for further proceedings consistent with this opinion.

## CONCLUSION

For the foregoing reasons, we conclude that the TIA does not deprive the district courts of jurisdiction to determine the constitutionality of the notice provided to the various taxpayers in this appeal. Accordingly, we vacate the judgments of the district court in *Baechle*, *Tupaz*, and *Bouchard*, and remand for further proceedings consistent with this opinion. We also hold that, due to the intervening Supreme Court case of *Jones v. Flowers*, —— U.S. ——, 126 S.Ct. 1708, 164 L.Ed.2d 415 (2006), the judgment of the district court in *Luessenhop* must be reversed and remanded for further proceedings not inconsistent with this opinion.