# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 06-3182

CHARLES D. LEVY and REFUND RESEARCH
ASSOCIATES, INC.,

*Plaintiffs-Appellants*,

*v.*

MARIA PAPPAS, individually and as Treasurer
of Cook County, *et al.*

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 C 6498—**George M. Marovich**, *Judge.*

ARGUED APRIL 11, 2007—DECIDED DECEMBER 21, 2007

Before CUDAHY, KANNE, and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* Charles Levy and his defunct company, Refund Research Associates, Inc. ("RRA") (to whom we refer collectively as Levy unless the context requires otherwise), have been locked in battle with the defendants, several Cook County officials and Cook County itself, for some time. The basis for Levy's complaints is the defendants' handling of Levy's efforts, as RRA's agent, to obtain real estate tax refunds for Cook County residents. The defendants contend that most of Levy's claims are barred by (among other things) the Tax Injunction Act

("the Act"), 28 U.S.C. § 1341. The district court agreed with their position, and so do we.

# I

The Tax Injunction Act is a somewhat unusual statute, in that it does not confer jurisdiction on the district courts, but instead it deprives them of jurisdiction they would otherwise have to hear certain challenges to state taxes. See, *e.g.*, *California v. Grace Brethren Church*, 457 U.S. 393, 396 (1982). The standard of review that we apply to the district court's decision here that the Act precludes the plaintiffs' claims, however, is the same as we would use for any jurisdictional challenge. Our review of the legal conclusion that these claims fall within the scope of the Act's prohibition is *de novo*. Insofar as the district court found facts to support its determination, as is sometimes necessary for jurisdictional decisions, see *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006), we review those findings of fact for clear error. *United Phosphorus, Ltd. v. Angus Chem. Co.*, 322 F.3d 942, 946 (7th Cir. 2003) (*en banc*). We recite the facts here in the light of these standards.

Levy was the president and sole shareholder of RRA, an Illinois corporation that has since been dissolved. RRA was engaged in the business of assisting taxpayers in obtaining real estate tax refunds. RRA would examine tax records to determine which taxpayers were entitled to real estate tax refunds, but had not yet received their money. Levy would contact these taxpayers in an effort to convince them to enter into an agreement with RRA whereby RRA would agree to file for a refund on behalf of the taxpayer, and the taxpayer would agree to pay RRA one-third of the money recovered.

In February 1999, Levy filed a lawsuit in Illinois state court against Maria Pappas in her official capacity as

Treasurer of Cook County, alleging a conspiracy through which Cook County retained millions of dollars in tax overpayments instead of refunding the amounts to taxpayers or turning over the money to the state of Illinois. After he filed that suit, he alleges, Pappas and other Cook County officials began to retaliate against him personally and against RRA. Specifically, Levy asserts that the Cook County officials placed obstacles in RRA's path to make it difficult for RRA to collect tax refunds for its clients, and that they caused a criminal investigation to be instigated against Levy.

Before the state court lawsuit was filed, RRA typically received requested refund checks approximately 35 days after it filed a refund application. After the lawsuit began, this period ballooned up to approximately 145 days. Levy also began having problems getting refund checks delivered directly to RRA. On one occasion in May 1999, when Levy arrived to collect a set of refund checks, a clerk told Levy that the checks could not be released because the office had lost the forms that authorized the Treasurer's office to release the checks to him instead of to the taxpayers themselves. Levy did not have copies of the authorization forms, and the Treasurer's office refused to release the checks to him based on copies of the contracts between the clients and RRA. It appears that the Treasurer's office still has some of these checks, but it is not clear what happened to the rest.

On or about May 25, 1999, Peter Karaholios, then Counsel for the Treasurer, told Levy that RRA did not have the right to conduct its business and that liens filed by RRA were invalid. After this point, refund checks were no longer delivered to RRA. By August 2002, Cook County Assessor James M. Houlihan arranged that checks issued to RRA clients would be mailed directly to the client, rather than to RRA.

Employees of the Treasurer's office made it difficult for Levy to get information. In April 1999, James Crawley (then Assistant General Counsel and later Counsel for Treasurer Pappas) informed Levy that incomplete applications for refunds would not be accepted and that the Treasurer's office did not have the personnel to find the "correct CR number" for Levy's applications. Because Levy was being forced to provide complete applications, Levy submitted a freedom-of-information request to inspect the CR book, which contains records of all certificates of error that have been authorized by the County Assessor. The Treasurer's office responded that Levy needed to specify a tax year and to pay a copying charge; Levy parried with a request to view the files in person. The Treasurer's office did nothing. Some time around August 1999, Levy was unable to review microfiche records at the Treasurer's office. Employees at the Treasurer's office informed Levy that in order to obtain a client's microfiche records, he would need a notarized power of attorney from his client. He had never before been required to produce such a form.

In August and September 2001, Levy had difficulty reviewing other records at the Treasurer's office. The Treasurer's office maintains and keeps CR books and JR books (which contain information about whether the authorized refunds have actually been paid). Levy wanted access to these books both in order to conduct RRA's business and to obtain evidence for his state court case. When he asked to inspect the CR and JR books, however, he was told he could not. Levy wrote a letter to Martha Mills, Chief Counsel for the Treasurer, who responded that Levy would be given access to the books. But as of the time when he filed his federal action, Levy had not been given access to the books. Levy alleges that Mills (and the other employees who failed to provide Levy with access to the books) acted at Pappas's direction. Another

FOIA request related to Levy's state court suit was stymied, because, Levy believes, Pappas and her employees in the Treasurer's office knew that Levy was behind it. Also, telephone calls by Levy and RRA clients went unreturned while the Treasurer's office returned phone calls placed by refund-seekers not represented by RRA.

As if these bureaucratic obstacles were not enough, the County defendants also allegedly retaliated against Levy with threats of criminal action. Around the same month when Levy filed his state court case, Karaholios told Levy that he (Karaholios) had been a prosecutor and that he was going to put Levy out of business. Levy interpreted the comment as a threat to institute criminal charges. In October 2000, Levy was at the Treasurer's office. In the presence of Pappas, Crawley, and Deputy Treasurer William Korukulis, Karaholios told Levy that Levy was "committing fraud by submitting refund applications using Refund Research's FEIN number instead of the taxpayer's social security number." Karaholios added that Pappas planned to submit the applications to the State's Attorney and file a complaint. Pappas picked up the refund applications Levy had with him, waved them at Levy and said, "This is fraud. I'm going to take this to the State's Attorney."

In April 2001, Amy Huang (a supervisor with the Financial Crimes Investigations Unit of the State's Attorney's office) sent letters to more than 500 clients of RRA. The letters stated in part:

> Our office is currently conducting a Criminal Grand Jury investigation pertaining to a complaint received from the Cook County Treasurer's office. According to records provided by the Cook County Treasurer's office, you filed a Certificate of Error Refund Application . . . , and designated Refund Research Associates, Inc. as Power-of-Attorney to complete the refund

application process. In order for this office to complete its investigation into said matter, please review the attached application and contact [us] if the information is incorrect. Our office would like to talk with you regarding the refund you have filed through Refund Research Associates, Inc.

At least once, a representative of the State's Attorney's office went to the home of an RRA client to ask the client to verify his signature; the client did so. In May 2001, an RRA client telephoned the Treasurer's office and spoke to an employee, Ilene Psarras. When the client asked about the status of her refund, Psarras told the client that checks payable to RRA were not being released because RRA was being investigated for cheating clients out of their money. The State's Attorney never charged RRA or Levy with unlawful conduct.

In 2004, Levy and RRA filed the present action in federal court. The amended complaint named Cook County and the following officials as defendants: Maria Pappas, the Treasurer of Cook County; William Korukulis, the Deputy Treasurer of Cook County; Martha Mills, the Chief Counsel for the Treasurer of Cook County; James Crawley, Counsel for the Treasurer of Cook County; Peter Karaholios, prior Counsel for the Treasurer of Cook County; James M. Houlihan, Assessor of Cook County; and Richard H. Devine, the State's Attorney for Cook County. All of the individual defendants were sued in both their official and individual capacities. Invoking 42 U.S.C. § 1983, the complaint charges "violations of Plaintiffs' First Amendment rights," infringements of plaintiffs' due process and equal protection rights, three RICO claims, a conspiracy claim, a tortious interference claim, and a conversion claim. The district court granted the defendants' motion to dismiss both the original and the amended complaints.

## II

The district court concluded that most of the plaintiffs' claims were barred by the Act and comity interests. The Act reads as follows:

> The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State.

28 U.S.C. § 1341. As the Supreme Court held in *Grace Brethren*, *supra*, it deprives the district court of jurisdiction to hear certain types of actions in federal courts. 457 U.S. at 396; see also *Hibbs v. Winn*, 542 U.S. 88, 104, 107 (2004). The Court took the opportunity in *Hibbs* to clarify the extent of this restriction. In that case, the plaintiffs challenged an income tax credit that provided financial aid to children attending private schools. 542 U.S. at 92-93. In finding federal jurisdiction over the matter, the Court held that for "a near half century, courts in the federal system, including [the Supreme] Court have entertained challenges to tax credits authorized by state law, without conceiving of § 1341 [the Act] as a jurisdictional barrier." *Id.* at 93. The Court contrasted those cases with those typically barred by the Act, describing the latter as cases in which "[a]ll involved plaintiffs . . . mounted federal litigation to avoid paying state taxes (or to gain a refund of such taxes). Federal-court relief . . . would have operated to reduce the flow of state tax revenue." *Id.* at 106. *Hibbs*, therefore, leaves the doors of the federal court open to a narrow category of state tax challenges.[1]

---

[1] Our concurring colleague is concerned that we have read the Act too broadly, as barring all claims where unjust treatment is alleged. *Post* at 16. As we explain in the body of the text, (continued...)

Nothing in *Hibbs* suggested that the Court was overruling its decision in *Fair Assessment in Real Estate Ass'n v. McNary*, 454 U.S. 100 (1981), an earlier opinion that discussed the related limits that comity doctrines impose on the adjudication of certain claims in federal court. *Id.* at 107 (basing decision on comity and declining to reach the question of whether the Act would also bar the suit). *Hibbs* cited *Fair Assessment* in a list of cases that fell "within § 1341's undisputed compass" (despite the fact that *Fair Assessment* itself was based on comity). 542 U.S. at 106. In *Fair Assessment*, the plaintiffs brought a § 1983 claim seeking damages based on equal protection and due process violations for unequal taxation of real property. 454 U.S. at 105-06. The Court commented that the Act

> [has] thus far barred federal courts from granting injunctive and declaratory relief in state tax cases [but b]ecause we decide today that the principle of comity bars federal courts from granting damages relief in such cases, we do not decide whether th[e Tax Injunction] Act, standing alone, would require such a result.

*Id.* at 107. The *Hibbs* Court noted without any hint of disapproval that the *Fair Assessment* opinion "relied upon 'principles of comity' . . . to preclude original federal-court jurisdiction only when plaintiffs have sought district-court

---

[1] (...continued)

however, we recognize that the Supreme Court, in *Hibbs* and other cases, reads the statute narrowly to bar only claims that would reduce the flow of state tax revenue. The only other difference is in the importance we attach to the type of relief plaintiffs seek, as opposed to the formal labeling of their complaints. Even if the Act did not bar plaintiffs' retaliation claims, as we believe it does, those claims are so closely linked to the state's collection of its revenues that comity principles would also require them to be dismissed.

aid in order to arrest or countermand state tax collection." 542 U.S. at 107 n.9.

Other circuits have understood *Hibbs* to be consistent with *Fair Assessment.* In *May Trucking Co. v. Ore. Dep't of Transp.*, 388 F.3d 1261 (9th Cir. 2004), the Ninth Circuit held that "the dispositive question in determining whether the Act's jurisdictional bar applies is whether 'federal court relief . . . would have operated to reduce the flow of state tax revenue.'" *Id.* at 1267 (quoting the *Hibbs* passage discussed above). This standard also applies in the Second and Tenth Circuit cases, which Levy cites, but which are not particularly helpful to him. See *Luessenhop v. Clinton County*, 466 F.3d 259, 268 (2d Cir. 2006); *Okla. ex rel. Okla. Tax Comm'n v. Int'l Registration Plan, Inc.*, 455 F.3d 1107, 1112 (10th Cir. 2006). In *Luessenhop*, the Second Circuit dealt with whether "a taxpayer's challenge that the notice of foreclosure provided by the taxing authority of a state is constitutionally inadequate"; it was not concerned with whether the tax assessed or the process of taxation was problematic. 46 F.3d at 261. In *Oklahoma Tax Commission*, the Tenth Circuit dealt with what was essentially a contract dispute involving the governmental recipients of revenue, some of which was tax revenue. Again, this was not a dispute about the tax or the taxation process. 455 F.3d at 1112.

As for comity, *Hibbs* commented that prior cases in this area are "not fairly cut loose from their secure, state-revenue-protective moorings." *Id.* at 107. The Court then quoted *Rosewell v. La Salle Nat'l Bank*, 450 U.S. 503, 527-28 (1981), which held that "we may readily appreciate the difficulties encountered by the county should a substantial portion of its rightful tax revenue be tied up in injunction actions." *Hibbs*, 542 U.S. at 107. Thus, *Hibbs* does not reject the use of comity to bar federal district court jurisdiction in broad strokes, but it does restrict

comity to cases that could tie up "rightful tax revenue." Applying this standard, *Hibbs* found that comity was not a reason to refrain from acting, because relief would have increased the state's tax revenues and would not have tied up any state tax revenues as in *Fair Assessment*.

In the end, it is not how Levy has described his complaint, but what relief he ultimately seeks, that matters. We must determine whether his claims are more like those in *Hibbs* or those in *Fair Assessment*. If the relief sought "would . . . operate[] to reduce the flow of state tax revenue" or would tie up "rightful tax revenue," then the Act bars federal jurisdiction over the claims. All of Levy's § 1983 claims stem from one of two sources, either the defendants' treatment of RRA in the real estate tax refund process or the defendants' treatment of Levy and RRA allegedly in retaliation for the state court action. In substance, most of the alleged retaliatory treatment is nothing but an allegation of unfairness in aspects of Cook County's tax refund process. The only part of the complaint that does not fit that description is the claim of a retaliatory criminal investigation against Levy, which we discuss in a moment.

The rest of the claims are, as the district court concluded, "essentially a complaint about the loss of tax refunds" and "about delayed refunds and defendants' ultimate refusal to issue taxpayer refund checks." The complaint repeatedly alleges lost profits as the primary injury suffered. Levy's business was obtaining tax refunds on behalf of RRA's clients. To the extent that this business was harmed by the failure to receive refunds, the relief sought would "operate[] to reduce the flow of state tax revenue." To the extent the plaintiffs' business was harmed by delaying refunds or even sending checks directly to taxpayers, the relief sought for this would tie up "rightful tax revenue" by freezing some money in the County's tax coffers and "arrest[ing] . . . state tax collec-

tion," putting the County's system of administering refunds at the mercy of the federal courts. The relief Levy is seeking goes to the heart of the County's ability to control its tax revenue by managing its real estate tax refunds. It would have a negative impact on the County's ability to rely on its own tax revenue. This is exactly what the Court was worried about in *Fair Assessment*.

When a plaintiff alleges that the state tax collection or refund process is singling her out for unjust treatment, then the Act and comity bar the federal action, as in *Fair Assessment*. When a plaintiff alleges that the state tax collection or refund process is giving unfair benefits to someone else, then according to *Hibbs* the Act and comity are not in play. This case falls on the *Fair Assessment* side of the line. The district court correctly held that the Act and comity bar its jurisdiction over the plaintiffs' claims in Counts I through V, with one exception: the criminal investigation. Any relief the court could give there would have no impact on the County's tax revenues and thus is not barred by either the Act or comity. With those threshold questions out of the way, we turn to the remainder of the arguments relating to this claim.

## III

### A

We begin our assessment of the plaintiffs' retaliation allegations with the question of RRA's standing to bring a § 1983 claim of retaliation for protected First Amendment activity. Generally speaking, a corporation may sue under § 1983. *Discovery House, Inc. v. Consol. City of Indianapolis*, 319 F.3d 277, 282 (7th Cir. 2003). RRA argues that it has standing "to assert a § 1983 Class of One claim." A "class of one" claim, however, relates to a § 1983 action for an equal protection violation, and we

have rejected RRA's equal protection challenge to Cook County's tax refund system.

RRA points to no case allowing a corporation (or anyone) to sue under § 1983 for retaliation against protected activity when that plaintiff engaged in no protected activity. RRA did not bring the state court case against the Treasurer's office; Levy did. Article III imposes prudential limitations on the class of persons who may invoke federal jurisdiction, and a litigant normally "must assert his own legal rights and cannot assert the legal rights of a third party." *Massey v. Helman*, 196 F.3d 727, 739 (7th Cir. 1999). Although RRA may have state tort claims against the defendants for their actions, those actions were not alleged to have been based on any First-Amendment-protected activity by RRA. We conclude, therefore, that RRA does not have standing to raise any claim of retaliation in what remains of this case.

B

That leaves Levy's retaliation claim. The district court held that he failed to state a claim against most of the defendants in their individual capacities and against all of the defendants in their official capacities. It ruled that his remaining claims against defendants Pappas and Karaholios in their individual capacities were time-barred. We begin with a comment on the statute of limitations and then consider the remaining arguments. The applicable statute of limitations here, which we borrow from Illinois, is two years. See 735 ILCS § 5/13-202; *Ashafa v. City of Chicago*, 146 F.3d 459, 461 (7th Cir. 1998). Levy alleges that his First Amendment claims were filed within this time, even though the allegedly retaliatory criminal investigation against him began more than two years before he filed his state complaint. It is possible that he is correct, if this is better seen as an ongoing injury than

as a harm triggered by a one-time event. See *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002) (recognizing that some "'unlawful employment practice[s]' therefore cannot be said to occur on any particular day," but instead occur "over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own"); see also *Heard v. Sheahan*, 253 F.3d 316, 318-19 (7th Cir. 2001) (discussing the "doctrine of continuing violation"); compare *Ledbetter v. Goodyear Tire & Rubber Co.*, 127 S.Ct. 2162, 2165 (2007) (holding that discrimination in pay and raises arose from discrete acts that triggered the applicable limitations period).

The district court characterized Levy's injury as one that was based on a discrete act and thus accrued at a particular time. We are not so sure. An ongoing criminal investigation is less like a singular event, such as being fired from a job or being beaten by a police officer, than it is like being denied medical treatment, or suffering from a hostile environment, or being maliciously prosecuted over an extended period of time. At this stage of the litigation, however, we need not make a definitive ruling on this issue. Even if we assume that Levy has successfully alleged a continuing injury and thus is not barred by the statute of limitations, his retaliation claims must be dismissed on other grounds.

C

The dispositive question is whether there is any defendant against whom Levy can assert his retaliation claim, insofar as it is based on the criminal investigation. In a § 1983 action, liability cannot attach against an individual defendant unless "the individual defendant caused or participated in a constitutional deprivation." *Vance v. Peters*, 97 F.3d 987, 991 (7th Cir. 1996). Most of Levy's

arguments on this point rest on allegations that we have rejected as barred by the Act. The amended complaint alleges, however, that "the continuing criminal investigation by the State's Attorney's office [was] with the assistance and involvement from personnel from the Office of the Cook County Treasurer" and that "Plaintiffs believe that some, if not all, of the inquiries were the product of a joint effort from employees in Pappas's office and the State's Attorney's office as part of the unlawful scheme." Once we are past the jurisdictional questions, because this is an appeal of a motion to dismiss, we take as true all well-pleaded factual allegations in the complaint and make all plausible inferences from those allegations in the plaintiffs' favor. *County of McHenry v. Ins. Co. of the W.*, 438 F.3d 813, 817 (7th Cir. 2006).

In the end, however, only the State's Attorney has the power to initiate criminal proceedings, and he has absolute immunity for these core prosecutorial functions. *Imbler v. Pachtman*, 424 U.S. 409, 431 (1976). Even taking as true all of Levy's allegations, nothing the other officials could have done could either force the State's Attorney to prosecute or compel him to refrain from prosecution. The complaint does not allege that the officials were suborning perjury or otherwise obstructing justice. At most, it appears to claim that Levy was defamed when the investigators contacted his clients and told them about the investigation, and when the officials accused him of fraud. That is not enough to state a claim against them for any role they may have had in the criminal investigation.

D

Finally, Levy's claim against Cook County as an entity runs into trouble at the outset with service of process. The district court found that he had failed to comply with

FED. R. CIV. P. 4(m), which sets the time limit for service. He has not complained about this on appeal, and so we leave that judgment undisturbed. As for the individual defendants in their official capacities, Levy claims that his constitutional injury was caused by a person with final policymaking authority, which is one allowable way to allege official liability. *McCormick v. City of Chicago*, 230 F.3d 319, 324 (7th Cir. 2000). The district court did not consider this approach.

The Supreme Court discussed that theory of official liability in *St. Louis v. Praprotnik*, 485 U.S. 112, 126-27 (1988). The official sued there was the person with final policymaking authority with respect to the challenged action taken against the plaintiff. *Id.* at 127. Here, Levy relies on Illinois law to show that Pappas and Houlihan have final policymaking authority for their respective offices. But no Illinois law gives the County Treasurer or Assessor "final policy-making authority" over launching criminal investigations, which is the only § 1983 claim Levy has left. Nor is there any allegation that any of the other defendants apart from State's Attorney Devine might have this kind of authority. And, as we just noted, to the extent that the State's Attorney is involved, the Supreme Court has held that "in initiating a prosecution and in presenting the State's case, the prosecutor is immune from a civil suit for damages under § 1983." *Imbler*, 424 U.S. at 431. This immunity is absolute. Thus, the district court properly dismissed Levy's claims against the individual defendants in their official capacity.

## IV

We have no need to reach the defendants' *res judicata* argument. The judgment of the district court is AFFIRMED.

CUDAHY, *Circuit Judge*, concurring. The big question here is whether the plaintiffs' lawsuit is barred by the Tax Injunction Act (TIA), as last analyzed by the Supreme Court in *Hibbs v. Winn*, 542 U.S. 88 (2004). The majority reads the TIA and comity as barring claims where the "plaintiff alleges that the state tax collection or refund process is singling her out for unjust treatment," but not claims where the "plaintiff alleges that the state tax collection or refund process is giving unfair benefits to someone else." (Op. at 11.) How exactly this distinction might work is unclear and its arguable basis in *Hibbs* is elusive.

Also, in evaluating whether Levy's claim is barred by the TIA or principles of comity, the majority relies on the relief Levy seeks, rather than "how Levy has described his complaint." (Op. at 10.) Since Levy is asking for lost profits, the majority reasons that payment of lost profits would "operate[ ] to reduce the flow of state tax revenue" and therefore is barred by *Hibbs*. (Op. at 10 (quoting *Hibbs*, 542 U.S. at 106)). This approach seems simplistic to me. I do not think it is enough to say that Levy's request for lost profits makes this lawsuit suspect under the TIA. In his state lawsuit and in the original federal complaint Levy asked for injunctive relief. I think this is significant and effectively distinguishes the claims in the first amended complaint, which really concerned harassment and retaliatory conduct, from those in the state lawsuit and the original federal complaint, which concerned the legitimacy of the tax refund process more broadly. I am concerned that the majority is conceding too much scope to the TIA, especially when the Supreme Court seems to be reading it fairly narrowly in *Hibbs*.

It is important to distinguish the present case from the action brought in state court by Levy in 1999. The defendants, and to a lesser extent, the district court, blur the

distinction between the claims and relief requested in the state lawsuit and the present one. This difference is significant because, if the 1999 lawsuit had been brought in federal court, it would clearly have been barred by the TIA. That case concerned how Cook County issued tax refunds and as a remedy prescribed the issuance of tax refund checks. The first amended complaint, which is the subject of the present appeal, does not, for the most part, concern the statutory scheme pursuant to which refunds are issued and its requested relief does not involve the issuance of refund checks. The present case, or at least the § 1983 claims, primarily concerns alleged retaliatory conduct, both harassment and the launching of a criminal investigation, by various Cook County officials, most notably Pappas and Karaholios. This part of the complaint is not barred by the TIA. As the Supreme Court explained in *Hibbs*, the TIA bars federal courts from challenging the assessment of taxes, where assessment is narrowly defined as "recording the liability of the taxpayer" and closely tied to the collection of a tax. 542 U.S. at 100-01. The Court concluded that the TIA applies only to "cases in which state taxpayers seek federal-court orders enabling them to avoid paying state taxes." *Id.* at 107. These claims raised by Levy in the first amended complaint do not concern how Cook County issues refunds. Therefore, the TIA as interpreted by the Supreme Court in *Hibbs* does not bar the plaintiffs' § 1983 claims.

As for the RICO claims, the plaintiffs allege three separate violations under RICO, 18 U.S.C. § 1962(a), § 1962(c) and § 1962(d). The plaintiffs' RICO claims primarily concern the plaintiffs' argument that Cook County has failed to issue refunds to taxpayers and has also fraudulently retained these refunds instead of turning them over to the State of Illinois pursuant to the Unclaimed Property Act. This was the crux of the 1999 state action and is clearly barred by the TIA. The district

court was clearly correct in dismissing the RICO claims for lack of jurisdiction as required by the TIA.

All of this said, I do think there is a strong statute of limitations argument for barring the non-criminal investigation retaliation claims, and therefore I would affirm the district court's grant of the defendant's motion to dismiss. I also agree with the majority's treatment of the criminal investigation retaliation claim, namely dismissing it on absolute immunity grounds.

A true Copy:

  Teste:

      _____
      *Clerk of the United States Court of*
      *Appeals for the Seventh Circuit*