# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 09-3975

EMPRESS CASINO JOLIET CORPORATION, *et al.*,

*Plaintiffs-Appellants*,

*v.*

BALMORAL RACING CLUB, INC., *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
Nos. 09 C 3585—**Matthew F. Kennelly**, *Judge*.

ARGUED FEBRUARY 23, 2010—REARGUED EN BANC MAY 10, 2011
DECIDED JULY 8, 2011

Before EASTERBROOK, *Chief Judge*, and BAUER, POSNER,
KANNE, WOOD, SYKES, TINDER, and HAMILTON, *Circuit
Judges*.[*]

POSNER, *Circuit Judge*. The plaintiffs, four riverboat
casinos operating in Illinois, brought this RICO suit

---

[*] Circuit Judges Flaum, Rovner, and Williams did not partici-
pate in the consideration or decision of this case.

against five Illinois racetracks, charging that the owner of two of the tracks, in cahoots with Illinois' then governor, Rod Blagojevich, had "bought" a pair of Illinois statutes harmful to the casinos. Enacted in 2006 and 2008 by large margins, these statutes, which are to remain in effect until the end of this year, require the casinos to deposit 3 percent of their revenues in a segregated state fund—the "Horse Racing Equity Trust Fund"—for disbursement to the racetracks within 10 days of receipt; the racetracks are directed to use the money to increase winners' and runner-ups' purses and improve the tracks. Ill. Pub. Act 94-804, effective May 26, 2006; Ill. Pub. Act 95-1008, effective Dec. 15, 2008.

The plaintiffs asked the district court to impose, as a remedy for the alleged violation of RICO, a constructive trust in their favor on the money received by the racetracks under these laws. The district judge issued a temporary restraining order that required that any money paid by the state fund be placed in an escrow account that the racetracks could not reach while the litigation was pending. Later the judge ruled that the Tax Injunction Act, 28 U.S.C. § 1341, barred equitable relief, of which the imposition of a constructive trust is a form. So he dissolved the temporary restraining order.

The casinos appealed. A panel of this court reinstated the temporary restraining order pending appeal (so the escrow remains in force and no money is being disbursed to the racetracks), and then reversed the district court (with one judge dissenting), holding that the Tax Injunction Act did not bar the casinos' quest for equitable

relief in federal court. 638 F.3d 519 (7th Cir. 2011). We granted rehearing en banc to reexamine that holding. The merits of the suit were not before the panel and are not before us. Moreover, upon the grant of rehearing en banc, the panel opinion was vacated only with regard to appeal No. 09-3975; the part of the panel's opinion and order that relates to appeal No. 10-1019, which had been consolidated with No. 09-3975, was unaffected by the grant of rehearing en banc and is unaffected by the present opinion. And the temporary restraining order pending appeal remains in force.

The Tax Injunction Act forbids federal district courts to "enjoin, suspend or restrain the assessment, levy or collection of any tax under State law," provided that an adequate remedy is available in the state courts, 28 U.S.C. § 1341, and it is in this case. The Act thus does not limit any substantive rights to enjoin a state tax but requires only that they be enforced in a state court rather than a federal court. The requirement serves to minimize the frictions inherent in a federal system of government, and is considered so important that the duty of federal courts to cede litigation seeking to enjoin state tax statutes to the state courts (a duty of "comity"—that is, of respect for another sovereign) extends beyond the limits of the Tax Injunction Act. *Fair Assessment in Real Estate Ass'n, Inc. v. McNary*, 454 U.S. 100, 110 (1981). The Act is just a "partial codification of the federal reluctance to interfere with state taxation." *National Private Truck Council, Inc. v. Oklahoma Tax Comm'n*, 515 U.S. 582, 590 (1995); see also *Levin v. Commerce Energy, Inc.*, 130 S. Ct. 2323, 2331-33 (2010). The Supreme

Court has told us to withhold decision even in situations to which the Act does not apply, though we won't have to take that step in this case.

*Ex parte Young*, 209 U.S. 123 (1908), had as a practical matter stripped away the states' sovereign immunity from equitable suits. So were it not for the Tax Injunction Act and the related doctrine of comity, " 'state tax administration might be thrown into disarray, and taxpayers might escape the ordinary procedural requirements imposed by state law. During the pendency of the federal suit the collection of revenue under the challenged law might be obstructed, with consequent damage to the State's budget, and perhaps a shift to the State of the risk of taxpayer insolvency.' " *Rosewell v. LaSalle Nat'l Bank*, 450 U.S. 503, 527 (1981), quoting *Perez v. Ledesma*, 401 U.S. 82, 128 n. 17 (1971) (separate opinion); see also *Hill v. Kemp*, 478 F.3d 1236, 1246-47 (10th Cir. 2007). The Act is "first and foremost a vehicle to limit drastically federal district court jurisdiction to interfere with so important a local concern as the collection of taxes." *Rosewell v. LaSalle Nat'l Bank*, *supra*, 450 U.S. at 522. The reason for this drastic limitation is that "it is upon taxation that the several States chiefly rely to obtain the means to carry on their respective governments, and it is of the utmost importance to all of them that the modes adopted to enforce the taxes levied should be interfered with as little as possible. Any delay in the proceedings of the officers, upon whom the duty is devolved of collecting the taxes, may derange the operations of government, and thereby cause serious detriment to the public." *Dows v. City of Chicago*, 78 U.S. (11 Wall.) 108, 110 (1871).

Not that enjoining a particular tax, depending on what it is, is certain to "derange the operations of government." But a general lowering of standards under the Tax Injunction Act could result in state fiscal policy being nickeled and dimed to death by an avalanche of suits by disgruntled taxpayers. (When the suit is not by taxpayers, but by persons objecting just to how the money is being spent, as in *Hibbs v. Winn*, 542 U.S. 88 (2004), the danger of interference with state tax administration is diminished; *Hibbs* holds that such suits are outside the Act's scope.) The application of the Act should not turn on judges' guesses about the importance of a particular tax to the legitimate operations of state government. Even the plaintiffs acknowledge that the allegedly corrupt origin of the statutes they attack does not bear on whether the exactions that those statutes impose are taxes within the meaning of the Tax Injunction Act. The Act would be thwarted if a taxpayer could get a federal court to enjoin the collection of a state tax just by presenting evidence of corruption in the process by which the taxing statute had been enacted. This principle has been recognized in analogous contexts, see, e.g., *City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 374-78 (1991) (state immunity from federal antitrust suits)—notably that of absolute immunity. *Pierson v. Ray*, 386 U.S. 547, 553-54 (1967).

We are mindful that the state is not a party to this suit. But the relief sought both is equitable and would thwart the tax as surely as an injunction against its collection. The taxpayers (the casinos) are seeking a constructive trust of the tax revenues, which if imposed would result

in their recapturing the taxes they have paid. The tax would be nullified. (If the tax statutes were not shortly to expire, the casinos would be seeking an injunction as well.)

The Act's forum-selecting character argues compellingly for a crisp rule distinguishing taxes from other exactions by states, such as fees charged for services provided (or prices charged for the sale or lease of state property), transfers of damages awarded to a state to the persons on whose behalf the state had sued (cf. *Trailer Marine Transport Corp. v. Rivera Vazquez*, 977 F.2d 1, 5 (1st Cir. 1992) ("the accident-compensation statute is essentially a social welfare program *and tort reform law* to impose on motor vehicle owners as a class the cost of the accidents they cause *and to assure compensation for accident victims*") (emphasis added)), and fines. A crisp rule determining which court system has jurisdiction to decide a particular type of case is needful because until the proper forum for a lawsuit is determined, the case cannot proceed; and if at any time until the decision resolving the litigation becomes final by exhaustion of appellate remedies it is discovered that the court rendering the decision lacked jurisdiction, the suit must start over from scratch in the forum that has jurisdiction. A challenge to the constitutionality of the casino-tax statutes brought by the casinos in the Illinois state court system against public officials rather than the racetracks has already been decided (adversely to the casinos) by the Supreme Court of Illinois. *Empress Casino Joliet Corp. v. Giannoulias,* 896 N.E.2d 277 (2008). The casinos brought a second suit in the Illinois courts, making

new allegations of corruption. While we federal judges are continuing to debate the proper venue of this case, the second state suit, too, has been decided on the merits, again adversely to the casinos. *Empress Casino Joliet Corp. v. Giannoulias*, 942 N.E.2d 783 (Ill. App. 2011), leave to appeal denied (Ill. S. Ct., No. 112003, May 25, 2011).

As the casino-tax litigation illustrates, "administrative simplicity is a major virtue in a jurisdictional statute . . . . Complex jurisdictional tests complicate a case, eating up time and money as the parties litigate, not the merits of their claims, but which court is the right court to decide those claims." *Hertz Corp. v. Friend*, 130 S. Ct. 1181, 1193 (2010). "Functional approaches to legal questions are often, perhaps generally, preferable to mechanical rules; but the preference is reversed when it comes to jurisdiction." *Hoaglund ex rel. Midwest Transit, Inc. v. Sandberg, Phoenix & Von Gontard, P.C.*, 385 F.3d 737, 739 (7th Cir. 2004). And so "the more mechanical the application of a jurisdictional rule, the better. The chief and often the only virtue of a jurisdictional rule is clarity." *In re Kilgus*, 811 F.2d 1112, 1117 (7th Cir. 1987) (citations omitted); see also *Kuntz v. Lamar Corp.*, 385 F.3d 1177, 1183 (9th Cir. 2004).

Although a jurisdictional rule should be simple and clear, where possible—and this *is* possible in regard to the Tax Injunction Act—a number of decisions under the Act, including the panel majority opinion, have flirted with open-ended, multifactor tests—open-ended because the relative weights of the factors are left to judicial discretion. Among the factors either urged by

the casino plaintiffs or mentioned in the cases are whether the legislature called the exaction a "tax" or something else (the Supreme Court of Illinois calls the casino exaction a "tax," but the plaintiffs insist that this is irrelevant—the legislature must use the word; it has not done so, instead calling the casino exaction a "condition of licensure"); whether the money generated by the exaction is deposited in a "lock box" type of trust fund (the only real kind, according to the plaintiffs, who call the Social Security Trust Funds a fraud); how quickly the money passes through the trust fund to the ultimate beneficiaries; the price elasticity of the taxed behavior; the amount of revenue collected by the exaction; whether that revenue is to be used for a traditional public purpose; whether the benefit that the fiscal program confers on the people of the state is direct or indirect; whether the exaction is designed to benefit one firm or a narrow group of firms (for example, racetracks) by oppressing a competitor or competitors (for example, casinos); whether enjoining its collection would prevent the state from paying its bills or even threaten it with insolvency; whether the persons or firms subjected to the exaction are numerous or few, whether the beneficiaries of the exaction are numerous or few, and what the relative size of the two groups is; whether the amount of revenue from the exaction that is transferred to the intended beneficiaries is determined by the legislature or is allowed to rise and fall with the fluctuations in that revenue; whether the plaintiff avoids naming state officials as defendants; whether the exaction was based on the state's taxing power or

on some other power, such as the police power (even though these are distinctions primarily relevant to the federal Constitution, which unlike state constitutions was designed, in order to protect state prerogatives, to be a constitution of limited, specified powers); and, as a kind of catchall, how much the exaction resembles what everyone would agree was a "tax," or as Wittgenstein might have wanted us to ask, how close a "family resemblance" the exaction bears to an exaction acknowledged by all to be a "tax." Is it a brother, or a third cousin?

The Supreme Court has not endorsed any multifactor test for applying the Tax Injunction Act, and such a test would be inappropriate quite apart from the need for clarity and simplicity in interpreting a forum-selection law. It is not a proper office of the federal courts to "reform" state fiscal policies by providing a federal forum for state taxpayers who object to the form or substance of laws designed to raise revenues for state purposes, whether purposes approved or disapproved by enlightened social thinkers. The wisdom of a tax on casinos to benefit racetracks is not a proper subject of inquiry by federal judges. "The federal balance is well served when the several States define and elaborate their own laws through their own courts and administrative processes and without undue interference from the Federal Judiciary. The States' interest in the integrity of their own processes is of particular moment respecting questions of state taxation." *Arkansas v. Farm Credit Services of Central Arkansas*, 520 U.S. 821, 826 (1997).

The only material distinction is between exactions designed to generate revenue—taxes, whatever the state

calls them (for what is a "tax" for purposes of the Tax Injunction Act is a question of federal rather than state law, *RTC Commercial Assets Trust 1995-NP3-1 v. Phoenix Bond & Indemnity Co.*, 169 F.3d 448, 457 (7th Cir. 1999); *Wright v. Riveland*, 219 F.3d 905, 911 (9th Cir. 2000); *American Landfill, Inc. v. Stark/Tuscarawas/Wayne Joint Solid Waste Management District*, 166 F.3d 835, 837 (6th Cir. 1999))—and exactions designed either to punish (fines, in a broad sense) rather than to generate revenue (the hope being that the punishment will deter, though deterrence is never perfect and therefore fines generate some state revenues), or to compensate for a service that the state provides to the persons or firms on whom or on which the exaction falls (or, what is similar, to compensate the state for costs imposed on it by those persons or firms, other than costs of providing a service to them): in other words, a fee. "If the fee is a reasonable estimate of the cost imposed by the person required to pay the fee, then it is a user fee and is within the municipality's regulatory power. If it is calculated not just to recover a cost imposed on the municipality or its residents but to generate revenues that the municipality can use to offset unrelated costs or confer unrelated benefits, it is a tax, whatever its nominal designation." *Diginet, Inc. v. Western Union ATS, Inc.*, 958 F.2d 1388, 1399 (7th Cir. 1992).

For examples of exactions held to be fees, see *Hager v. City of West Peoria*, 84 F.3d 865, 870-71 (7th Cir. 1996) (fees for permits for use of certain streets by heavy trucks); *Government Suppliers Consolidating Services, Inc. v. Bayh*, 975 F.2d 1267, 1271 n. 2 (7th Cir. 1992) (registration

fees for waste collection vehicles), and *Trailer Marine Transport Corp. v. Rivera Vazquez, supra*, 977 F.2d at 4-6 (annual fee imposed on owners of motor vehicles to fund compulsory accident compensation). For examples of nominal "fees" held to be taxes for purposes of the Act, see *Hill v. Kemp, supra*, 478 F.3d at 1243-46 (revenue from sale of specialty license plates greatly exceeded cost of the plates and the excess was earmarked for purposes, such as promotion of adoptions, tied to the legend on the plate); *Folio v. City of Clarksburg*, 134 F.3d 1211, 1217 (4th Cir. 1998) (city fee for fire protection); *Wright v. McClain*, 835 F.2d 143, 144-45 (6th Cir. 1987) (parolee's payments to a victim compensation fund); cf. *Diginet, Inc. v. Western Union ATS, Inc., supra*, 958 F.2d at 1399 ("franchise fee" imposed on use of a fiber optic network to generate revenues that are "use[d] to offset unrelated costs or confer unrelated benefits"). In listing these cases, however, we do not mean to endorse their specific holdings, based as they often are on questionable multifactor tests.

The line between a tax and a fee, and a tax and a fine, is sometimes fuzzy, and in a borderline case factors that distinguish between rather similar-looking exactions may be useful tools for determining on which side of the line the case falls. For example, a tax might be so totally punitive in purpose and effect that, since nomenclature is unimportant, it should be classified as a fine rather than a tax. "The mere use of the word 'tax' in an act primarily designed to define and suppress crime is not enough to show that within the true intendment of the term a tax was laid. When by its very nature the imposi-

tion is a penalty, it must be so regarded." *Lipke v. Lederer*, 259 U.S. 557, 561-62 (1922) (citation omitted); see also *Retail Industry Leaders Ass'n v. Fielder*, 475 F.3d 180, 189 (4th Cir. 2007); *Denton v. City of Carrollton*, 235 F.2d 481, 485 (5th Cir. 1956); *RTC Commercial Assets Trust 1995-NP3-1 v. Phoenix Bond & Indemnity Co.*, *supra*, 169 F.3d at 457-58. And so in *Department of Revenue v. Kurth Ranch*, 511 U.S. 767, 782 (1994), the Supreme Court held that a state marijuana "tax" was actually a fine, noting among other things that it was exacted only after the taxpayer had been arrested for the conduct that had given rise to the tax obligation and that because the taxed activity was completely forbidden "any legitimate revenue-raising purpose that might support such a tax could be equally well served by increasing the fine imposed upon conviction."

Or imagine a fee that has aspects of a tax because the revenue it generates is greater than is needed to fund the service for which the fee is the charge, and the surplus goes into the state's general funds. In *Schneider Transport, Inc. v. Cattanach*, 657 F.2d 128, 132 (7th Cir. 1981)—a case indistinguishable from the present case— we held that what was called a fee was actually a tax; we said: "although not denominated as such, the [vehicle] registration fees are imposed for revenue-raising purposes, a characteristic of any tax. The fees are deposited in a segregated fund, the state transportation fund, for transportation purposes, including highway construction. The revenues from the fund 'are deposited into funds other than the general fund and are available for the purposes for which such funds are cre-

ated'" (citations omitted). The First Circuit reached the opposite conclusion in *San Juan Cellular Telephone Co. v. Public Service Comm'n*, 967 F.2d 683 (1st Cir. 1992); it held that a fee imposed on phone companies to defray the expenses of regulating them was not a tax even though the fee generated more revenue than needed to meet those expenses and the surplus was used for other state purposes rather than returned to the companies.

Fees for products (people buy electricity from public utilities) and bona fide user fees (a toll for crossing a bridge, for example) are not "taxes" in either lay or legal lingo. Similarly, bona fide user fees for wharfs and tugboats aren't taxes for the purpose of the Constitution's import-export duties clause, or the rule against discriminatory taxes on interstate commerce. But "sin taxes" are real taxes and so are taxes that go into limited-purpose funds, such as the FICA tax and the gasoline tax. We mustn't write transfer payments and behavior-shaping taxes out of the Tax Injunction Act just because it is easier with such taxes to identify winners and losers. The Act would have a very limited reach if we did that.

The recent decision in *Kathrein v. City of Evanston*, 636 F.3d 906, 912-13 (7th Cir. 2011), classified a city "demolition tax" as not being a tax for purposes of the Tax Injunction Act, but instead as being a regulatory device (like the Prohibition-era tax on alcohol that we mentioned) because its sole purpose, the panel concluded, was to keep poor people in their homes. The tax would deter demolitions and the modest fund generated

by it (a trivial $90,000 each year) would be used to subsidize those poor people and thus amplify the effect of the tax in enabling them to keep their homes out of reach of the wrecker's ball. We do not agree with that decision. Taxes that seek both to deter and to collect revenue when deterrence fails (liquor taxes are an example) are commonplace, and these sin taxes often are an important component of state fiscal policy because there are so many unrepentant sinners.

The exaction imposed on the casinos is not a fine or a fee, and is therefore (if there is to be a simple and clear jurisdictional rule) a tax; the panel majority was explicit that it was not a fee and no one suggests that it's a fine. It is instead an example of a state's taking money from one group of firms and giving it to another group, in much the same way that federal income tax takes money from persons and firms mostly in the nonagricultural sector of the economy and Congress gives some of the tax revenues to the tiny but influential agricultural sector in the form of farm subsidies: in other words, tax and spend, and the taxpayers and the recipients of the tax revenues needn't be the same.

The fact that the casino exaction isn't called a tax, is placed in a trust fund, passes speedily from taxpayer to recipient, is justified by reference to the police power of the state rather than the state's taxing power, etc., has nothing to do with any concern behind the Tax Injunction Act. "Taxation" is unpopular these days, so taxing authorities avoid the term. Legislatures are unpredictable, so trust funds are created to hold revenues generated by

specific taxes, in order to avoid annual appropriations battles. The politics of state taxation have naught to do with the policy of the Tax Injunction Act. If in the guise of "interpreting" the Act the courts insist on greater candor or directness in state taxing legislation as the price for avoiding federal-court suits to enjoin state tax collections, we shall make it difficult, given the politics of tax-and-spending legislation, for states to raise revenues—we shall be doing just what the Supreme Court in *Rosewell* said it was the object of the Act to prevent doing: throwing state tax administration into disarray.

Gambling taxes, including casino taxes, are not unique to Illinois. See Ind. Code §§ 4-33-12-1, -6(b)(6); N.J. Stat. §§ 5:12-203(a), -205; cf. Md. Code, State Gov't, §§ 9-1A-27(a)(5), -29. They are real taxes, not fees. Their aim is to raise revenue, not to cover costs. That the revenue is earmarked for a particular purpose is hardly unusual; think of the social security tax. Congress does, it is true, define the exact benefits to which each social security recipient is entitled. But the aggregate benefits vary with the number of recipients, rather than being specified. The benefits conferred by another earmarked federal tax, the federal tax on gasoline, likewise fluctuate; the amount of revenue generated by the tax varies from year to year because it's a tax on gallonage and so depends on the amount of driving and on the gas consumption of the vehicles driven. See, e.g., U.S. Energy Information Administration, "Annual Energy Outlook 2011," p. 10 (2011), www.eia.gov/forecasts/aeo/pdf/0383(2011).pdf (visited July 1, 2011).

A tax, possibly of corrupt origin, levied on one set of gambling enterprises to subsidize another may seem a fiscal travesty. But what has that to do with the Tax Injunction Act? And, though we don't think this matters, we note that horse racing is a major activity in Illinois and one with economic significance for the state. It employs more than 30,000 people and generates more than $700 million in annual betting and some $15 million in state and local government revenues. Ill. Pub. Act 94-804, § 1(3)-(4); Illinois Racing Board, "2010 Annual Report" 2, 6 (Mar. 2011), www2.illinois.gov/irb/ Documents/AnnualReports/2010_Annual_Report.pdf (visited July 1, 2011); Commission on Government Forecasting and Accountability, "Wagering in Illinois—2010 Update" 53-60 (2011), www.ilga.gov/commission/ cgfa2006/Upload 2010wagering_in_il.pdf (visited July 1, 2011). And that's just the beginning, because horse racing boosts the equine population of Illinois, which benefits breeders, horse farms, feed companies, and other businesses ancillary to horse racing. Bill Wright, "Where Illinois' Economy Gets Its Horsepower," *Chicago Tribune*, Mar. 10, 2002, p. 6.

There is also Illinoisians' sentimental affection for horses which we noted in *Cavel Int'l, Inc. v. Madigan*, 500 F.3d 551 (7th Cir. 2007), where we upheld against a commerce clause challenge the decision by the Illinois legislature—inspired by movie actress Bo Derek, *id.* at 559, a notable horse lover—shutting down the last slaughterhouse in the United States (which happened to be in Illinois) that was permitted to slaughter horses for human consumption. States routinely subsidize favored activi-

ties—not by taxing the persons or firms engaged in the activities, which would make the "tax" a fee and negate the subsidy, but by taxing someone else. Are animals not appropriate objects of state subsidy? Cannot Citation, Man 'o War, Seabiscuit, and Secretariat be distinguished, as objects of public solicitude, from roulette wheels and one-armed bandits?

Casinos are recent additions to the legal gambling scene in Illinois; the first casino in the state opened in 1991. Jerry Shnay, "Alton Riverboat Already Hitting Jackpot," *Chicago Tribune*, Sept. 25, 1991, at 4. They compete with the racetracks and thus attract gamblers away from them. So at least it is widely believed, see Illinois Harness Horsemen's Ass'n, Press Release, "Top State Horsemen Flee to Greener Pastures in Eastern States" (Nov. 30, 2005), and William Nack, "A House Divided," *Sports Illustrated*, July 10, 1995, at 52, 56, though Douglas M. Walker and John D. Jackson, in their article "Do U.S. Gambling Industries Cannibalize Each Other?," 36 *Public Finance Rev.* 308, 322-24 (2008), present contrary evidence—evidence that casino and other non-racetrack gambling increases the demand for racetrack gambling by increasing the demand for gambling in general. What is not debatable is that, whether because of the advent of casinos or because of other factors, race-track attendance and revenues in Illinois have plummeted in recent years, along with the state's horse population and commercial activities that are correlated with the number of horses. Illinois Racing Board, *supra*, at 9; Commission on Government Forecasting and Accountability, *supra*, at 59-60; Will Buss, "Hoffman: Bill Will

Help Fairmount," *Belleville News-Democrat*, Mar. 27, 2008, p. A1. The first of these sources shows horse-racing bets falling from $1.2 billion in 1996 to $.7 billion in 2010, though some of the drop is doubtless due to the economic crisis that began in 2008; the 2007 total was $900 million.

Sixty percent of the subsidy created by revenues from the casino tax is earmarked for the purses for winners and runners-up in the horse races, on the theory that bigger purses attract the owners of the better horses and the better the horses in a race the larger the attendance and therefore the more money is bet and so the greater the track's revenues are because they're a percentage of the amount of money that is bet. The other 40 percent is earmarked for physical improvements of the racetracks. The subsidy is rationally designed to promote the horse racing industry in Illinois, which seems no less proper an objective than promoting a state's film industry by offering tax credits or other financial incentives to filmmakers, a common form of state subsidy. Horse racing and movies are two forms of entertainment. Are the taxes that provide the revenue to subsidize such activities not taxes at all, but instead—what?

In a laissez-faire or Social Darwinist society, as dreamed by Herbert Spencer (the target of Holmes's crack that "the 14th Amendment does not enact Mr. Herbert Spencer's Social Statics," *Lochner v. New York*, 198 U.S. 45, 75 (1905)), the government would keep its hands off the competition between the casinos and the racetracks. The disappearance of racetracks, jockeys,

horses, bridles, blacksmiths, racetrack touts, and DVDs of *National Velvet*—replaced by croupiers, glassy-eyed retirees at one-armed bandits, roulette wheels, and blackjack tables, all on riverboat casinos—would be commended as progress. But American government is not committed to the laissez-faire vision of society. We find no hints of Social Darwinism in the Tax Injunction Act. Congress and state legislatures frequently use their taxing, spending, and regulatory powers to redistribute wealth from one group in society to another. This is a familiar exercise of taxing power and whether unconstitutional in particular instances (in the Illinois courts the casinos unsuccessfully attacked the casino tax as an uncompensated taking), it is still taxation, which is our only concern in this appeal. Federal payroll taxes are earmarked for such expenditure programs as Medicare, social security, and unemployment benefits; the federal gasoline tax is used to subsidize highway construction; other earmarked taxes are common. See Susannah Camic, "Earmarking: The Potential Benefits," 4 *Pitt. Tax Rev.* 55, 60-61 (2006). Rarely are taxpayers closely matched with the recipients of the spending that the taxes support. If you die before reaching the age of 62, you get no social security benefits even if you've been paying social security tax for 40 years.

Illinois' casino tax is not an isolated example of taxing one industry for the benefit of another. The federal Audio Home Recording Act of 1992 taxes digital media to subsidize prerecorded media, 17 U.S.C. § 1001 *et seq.* (though the tax has, as many taxes do, a punitive purpose as well—to discourage illegal copying of recordings). The

Illinois Coal Technology Development Assistance Fund taxes gas and electrical utilities to pay for the development of coal technologies, 30 ILCS 730/3. And Ohio taxes wine from all over the world to pay for research on grapes in Ohio. Ohio Rev. Code Ann. §§ 924.51 *et seq.*, 4301.43(B).

When the plaintiffs call the casino tax a "fee," they do so because they want a word to describe what the casino exaction is: if it is not a tax or a fee (or a fine), what is it? The panel majority, emphasizing the adverse effect of the tax on the casinos, called it "a regulatory penalty or fee." Fees for services are not taxes, but no services are rendered to the casinos in exchange for their having to give up 3 percent of their revenues. All the money goes to the racetracks. The plaintiffs try to blur the distinction by quoting from a previous opinion of this court that "courts faced with distinguishing a 'tax' from a 'fee' 'have tended . . . to emphasize the revenue's ultimate use, asking whether it provides a general benefit to the public, of a sort often financed by a general tax, or whether it provides more narrow benefits to regulated companies or defrays the agency's cost of regulation.'" *Hager v. City of West Peoria, supra*, 84 F.3d at 870, quoting *San Juan Cellular Telephone Co. v. Public Service Comm'n, supra*, 967 F.2d at 685. The reference to "narrow benefits" may seem to describe this case, since only racetracks received the proceeds of the casino tax. But this is to ignore the words in the *Hager* opinion that follow "provides more narrow benefits": "to regulated companies or defrays the agency's cost of regulation." The revenues from the tax on the casinos does not go to pay

for some service that the State of Illinois renders to casinos, or, what amounts to the same thing, to some service that is required by the existence of casinos, in the same way that expenses incurred to regulate telephone companies were necessitated by those companies and hence were part of the regulatory costs (*San Juan Cellular*). The casino tax goes to subsidize racetracks, and so it falls within the rule that exactions of money earmarked for designated purposes rather than collected just to swell the state's coffers are taxes within the meaning of the Tax Injunction Act even if imposed for a reason of which judges disapprove.

The plaintiffs point us to *Bidart Brothers v. California Apple Comm'n*, 73 F.3d 925 (9th Cir. 1996), but that case involved an assessment of fees on apple producers to support advertising and other activities designed to boost apple consumption. The fees were to pay for services to the payors of the fees. Taxes often are levied on people or firms that will derive no benefit at all from them, as in the present case.

The practical reason for the difference in treatment under the Tax Injunction Act between fees and taxes is that enjoining the collection of a fee is less likely to disrupt state programs than enjoining a tax. Fees are for services and if the collection of the fees is enjoined, the state can curtail the services. Cf. *Ben Oehrleins & Sons & Daughter, Inc. v. Hennepin County*, 115 F.3d 1372, 1383 (8th Cir. 1997); *San Juan Cellular Telephone Co. v. Public Service Comm'n, supra*, 967 F.2d at 686-87. But if the use of tax moneys to subsidize racetracks is prohibited, the subsidy

program will be thwarted—unless the rule is to be that an earmarked tax, held to be enjoinable, can be replaced by a tax having a broader base and a suit against the replacement in federal court would be blocked by the Tax Injunction Act. This would inject the federal courts deeply into the design of federal-injunction-proof state taxes. It is another reason not to distort language by calling the casino tax a fee.

It's true that the plaintiffs are not seeking to enjoin the casino tax in the narrow sense of "enjoin." The money is being collected from the casinos for intended payment to the racetracks; it is being held in escrow pending the outcome of this appeal; it will be paid to them if they prevail—but only if they prevail. A constructive trust, however, is an equitable remedy, just like an injunction. *Bontkowski v. Smith*, 305 F.3d 757, 761 (7th Cir. 2002); *Beatty v. Guggenheim Exploration Co.*, 122 N.E. 378, 380 (N.Y. 1919) (Cardozo, J.); 1 Dan B. Dobbs, *Law of Remedies* § 4.3(2), pp. 589-90 (2d ed. 1993). If allowed in cases in which an injunction would be unlawful, a constructive trust in favor of the taxpayers would defeat the purpose of the Tax Injunction Act as effectively as an injunction would. As we explained earlier, a constructive trust gives the tax money back to the taxpayers; the money goes in a circle. And so the Second Circuit has invalidated in the name of the Tax Anti-Injunction Act, 26 U.S.C. § 7421(a)—the counterpart, in federal taxation, to the Tax Injunction Act—the imposition of a constructive trust on moneys that would otherwise have been used to satisfy federal tax liabilities. *SEC v. Credit Bancorp, Ltd.*, 297 F.3d 127, 137-38 (2d Cir. 2002).

Other forms of equitable relief have been held to be forbidden by the Tax Injunction Act when, even though no equitable relief was sought against the state itself, the relief sought would have indirectly but substantially impeded state tax collection. In *Sipe v. Amerada Hess Corp.*, 689 F.2d 396, 403-04 (3d Cir. 1982), for example, the plaintiffs sought to enjoin their employers from deducting unemployment taxes from their paychecks. And in *RTC Commercial Assets Trust 1995-NP3-1 v. Phoenix Bond & Indemnity Co.*, *supra*, 169 F.3d at 454-56, the plaintiff sought a declaration that a tax certificate that the private defendant had purchased at a tax sale was invalid. See also *Blangeres v. Burlington Northern, Inc.*, 872 F.2d 327, 328 (9th Cir. 1989) (per curiam); cf. *California v. Grace Brethren Church*, 457 U.S. 393, 407-11 (1982); *Wright v. Pappas*, 256 F.3d 635 (7th Cir. 2001).

There is one last point to consider. The Tax Injunction Act bars federal equitable relief only if the plaintiffs have available to them a state remedy that is "plain, speedy and efficient." 28 U.S.C. § 1341; see, e.g., *Rosewell v. LaSalle Nat'l Bank*, *supra*, 450 U.S. at 512-15. There is such a remedy in this case; the casinos can ask an Illinois state court to impose a constructive trust on the tax receipts. See *Village of Itasca v. Village of Lisle*, 817 N.E.2d 160, 170 (Ill. App. 2004); *Selmaville Community Consolidated School Dist. No. 10 v. Salem Elementary School Dist. No. 111*, 421 N.E.2d 1087, 1091 (Ill. App. 1981). Whether they can seek a refund of the taxes they paid is less clear, because it is unclear whether the refund statute cited by the parties—the State Officers and Employees Money Disposition Act, 30 ILCS 230/2a, the statutory

basis for the casinos' claims in *Empress Casino Joliet Corp. v. Giannoulias, supra,* 896 N.E.2d at 283—authorizes the recovery of tax money that has already been disbursed. But if the unlawfulness can be traced to the racetracks, the casinos can seek damages from them. The Tax Injunction Act does not bar federal monetary relief. What the federal courts must not do is freeze the state's tax moneys by imposition of a constructive trust.

The judgment of the district court is affirmed, but the temporary restraining order against releasing money from the escrow is extended for 30 days from the date of this decision to enable the plaintiffs to ask our Circuit Justice to continue the order pending the casinos' petitioning the Supreme Court for certiorari.

AFFIRMED.

SYKES, *Circuit Judge*, with whom BAUER and KANNE, *Circuit Judges,* join, dissenting. Anyone reading the en banc opinion might lose sight of the fact that this is not the kind of lawsuit in which jurisdictional questions under the Tax Injunction Act ("TIA") typically arise. It's not a public-law suit against a state or local taxing authority seeking a remedy against the enforcement of a tax statute or otherwise interfering with the collection of

state or municipal revenue. It's a RICO suit between private parties seeking a private-law remedy.

The TIA prohibits district courts from hearing actions to "enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." 28 U.S.C. § 1341. The Act withdraws federal jurisdiction over suits seeking forms of equitable relief—declaratory and injunctive—against state and local tax assessments. *California v. Grace Brethren Church*, 457 U.S. 393, 410-11 (1982). This lawsuit does not seek an equitable remedy against the assessment or collection of a tax. The plaintiffs have asked for a constructive trust on a *private* account holding money alleged to be the proceeds of a racketeering conspiracy. If they prevail and a constructive trust is imposed, the collection of state revenue will not be imperiled. Not a penny of state money would be affected. The private-party defendants would be prevented from reaping the benefits of the conspiracy, but the TIA does not block federal jurisdiction over suits to prevent private unjust enrichment.

To be sure, this case *does* involve allegations of public corruption in the promulgation of a state subsidy program, but that's not enough to trigger the TIA's jurisdictional bar. The subsidy in question is structured in an unusual way, and it came into being under circumstances that led to the indictment, impeachment, and removal of the Illinois governor, and a long-running state-court constitutional challenge.

The plaintiffs, four riverboat casinos in Illinois, claim that two Illinois gaming laws—the 2006 and 2008 Horse

Racing Acts—were the product of a pay-to-play scheme between former Governor Rod Blagojevich and John Johnston, the owner of two Illinois horse-racing tracks. The Acts imposed an unusual license requirement on the four casinos (and only these four, by virtue of their being the most profitable in the state). The four casinos must directly subsidize a select group of their competitors—five Illinois horse-racing tracks, including the two owned by Johnston—as a condition of their state gaming licenses. The Acts compel them to pay a percentage of their revenue into a segregated fund for direct pass-through to the racetracks. It's important to note that the money paid into this fund is not state general revenue and is not subject to appropriation; instead, the money is held in trust for the sole benefit of the five racetracks and is disbursed directly to the beneficiary tracks soon after receipt.

More specifically, the 2006 Racing Act created, and the 2008 Racing Act renewed, the Illinois "Horse Racing Equity Trust Fund," a "non-appropriated trust fund held separate and apart from State moneys" for the benefit of the horse-racing tracks. 230 ILL. COMP. STAT. 5/54.5(a) (2006) (repealed 2008) (the 2006 Act); 230 ILL. COMP. STAT. 5/54.75(a) (2011) (the 2008 Act).[1] Under the Acts the four casinos are required "as a condition of licensure" to "pay into the Horse Racing Equity Trust Fund . . . an amount equal to 3% of the adjusted gross receipts

---

[1] Except for citations to the 2006 Act, which are hereafter cited as § 5/54.5 (2006), all subsequent citations to the *Illinois Compiled Statutes* are to the current edition.

received by the owners [sic] licensee." *Id.* § 10/7(a). The money paid into this fund "shall be distributed within 10 days" of deposit directly to the beneficiary horse-racing racetracks; the racetracks must direct 60% of the money received to the purse and the remaining 40% to improvements, marketing, and operating expenses. *Id.* §§ 5/54.5(b) (2006), 5/54.75(b). The Horse Racing Fund is administered by the state Racing Board in accordance with the terms of the Acts, *id.* § 5/54.75(a), and the money in the Fund may *not* be transferred to the State's General Revenue Fund, 30 ILL. COMP. STAT. 105/8h(a).

As the panel opinion explained, the casinos paid the 3% surcharge into a protest fund and waged a vigorous constitutional attack on the Racing Acts in state court. *See Empress Casino Joliet Corp. v. Blagojevich*, 638 F.3d 519, 524-27 (7th Cir. 2011). The state supreme court rejected this challenge, *see Empress Casino Joliet Corp. v. Giannoulias*, 896 N.E.2d 277 (Ill. 2008), and the money in the protest fund was set to pay out to the racetracks. In the meantime, however, Governor Blagojevich was indicted on federal charges of public corruption, including some relating to the pay-to-play scheme involving Johnston and the racetracks. *Empress Casino*, 638 F.3d at 525. The Illinois House of Representatives quickly impeached him and the Senate removed him from office. The casinos then brought this federal RICO suit against Blagojevich, his campaign committee, Johnston, and the two racetracks he owns. *Id.* at 526. Tracing the allegations in the federal indictment, the casinos claimed that Blagojevich "sold" his support for the Racing Acts in exchange for campaign cash from Johnston. *Id.* at 522-23.

To prevent the five racetracks from being unjustly enriched by the proceeds of the alleged racketeering conspiracy, the complaint also named as defendants the three racetracks not owned by Johnston. The casinos sought a constructive trust on the money all five race-tracks received from the Horse Racing Fund. *Id.* at 526-27. Those funds are held in a private account owned by the racetracks, *not* in the state treasury or in any state-owned or -administered account. The money in the protest fund was paid out to the racetracks but is held in escrow under the terms of a temporary restraining order entered by the district court and kept in place by order of this court pending resolution of this appeal. The escrow continues to grow as the casinos periodically pay the 3% surcharge, and the money is disbursed to the racetracks within ten days of deposit, as required by the Acts. To be clear, the casinos did *not* name any state agency or governmental official as a defendant in this action and do *not* seek to invalidate the Racing Acts or obtain a remedy against the Horse Racing Fund.

The en banc opinion obscures these critical facts, which are necessary to bring the jurisdictional issue into proper focus. For example, my colleagues acknowledge that "the state is not a party to this suit," Majority Op. at 5, but in the very next breath say the casinos are "seeking a constructive trust [on] tax revenues," and speculate that the casinos "would be seeking an injunc-tion as well" if the Racing Acts "were not shortly to expire," *id.* at 5-6. This gives the impression that the casinos are seeking equitable relief against the Racing Acts or a remedy that would operate on tax money owed to or

held by the State. They are not. As I have explained, the complaint does not name any state agency or any official responsible for enforcing the Racing Acts as a defendant; nor have the casinos asked for injunctive or declaratory relief against the enforcement of the Acts or sought a constructive trust on tax money owed to or held by the State.

The en banc opinion also warns that

> [i]t is not a proper office of the federal courts to "reform" state fiscal policies by providing a federal forum for state taxpayers who object to the form or substance of laws designed to raise revenues for state purposes, whether purposes approved or disapproved by enlightened social thinkers. The wisdom of a tax on casinos to benefit racetracks is not a proper subject of inquiry by federal judges.

*Id.* at 9. This passage also suggests that this litigation takes aim at a state tax law. Not so. This case *does* concern the corrupt origins of the Racing Acts but does *not* challenge their validity or the manner in which they are enforced. The district court has been asked to adjudicate a racketeering claim, not to pass judgment on the fiscal policy of the State of Illinois or the wisdom of compelling casinos to subsidize racetracks. This case will not require the federal judiciary to decide whether the purposes behind the Racing Acts comport with enlightened social thinking. Justice Holmes will not roll over in his grave; his *Lochner* dissent remains undisturbed. *See id.* at 15 (citing *Lochner v. New York*, 198 U.S. 45, 75 (1905) (Holmes, J., dissenting)). At the risk of repeating myself,

no remedy is sought against the State, its tax policies, or its revenue-raising apparatus. A constructive trust would have no effect on state revenue but would operate *only* on funds received by the racetracks and held by them in private escrow in order to prevent their unjust enrichment.

My colleagues do not meaningfully address this critical fact until the very end of the en banc opinion, *see id.* at 22-23, and their effort to explain it away is ineffective. It is true that the TIA's jurisdictional bar is sometimes applied "even though no equitable relief was sought against the state itself," but *only* if "the relief sought would . . . indirectly but substantially impede[] state tax collection." *Id.* at 23 (citing *Grace Brethren Church*, 457 U.S. 393; *Wright v. Pappas*, 256 F.3d 635 (7th Cir. 2001); *RTC Commercial Assets Trust 1995-NP3-1 v. Phoenix Bond & Indem. Co.*, 169 F.3d 448 (7th Cir. 1999); *Blangeres v. Burlington N., Inc.*, 872 F.2d 327 (9th Cir. 1989); *Sipe v. Amerada Hess Corp.*, 689 F.2d 396 (3d Cir. 1982)). In each of the cases cited for this proposition, state or local taxing authorities were parties to the litigation and the relief sought would have impeded their receipt of taxes or otherwise depleted the public fisc.[2] That is not

---

[2] *See California v. Grace Brethren Church*, 457 U.S. 393, 407-11 (1982) (TIA barred a claim for declaratory relief against collection of state unemployment taxes from religious schools because it would have interfered with the State's collection of those taxes; California was a party); *Wright v. Pappas*, 256 F.3d 635, 637-38 (7th Cir. 2001) (TIA barred a claim seeking an equitable remedy against a Cook County tax-lien sale based on alleged

(continued...)

the case here. A constructive trust on the racetracks' private escrow would have no effect on state funds and would not interfere with the State's collection of taxes, either directly or indirectly. No state taxing authority is a party. From all appearances, Illinois is indifferent to this case.

What makes this case difficult is that the casino surcharge is unusual and therefore hard to classify. My colleagues call it a tax. With respect, I disagree. Our disagreement, however, does not arise from different views on the essential principles underlying the TIA. The central concern of the TIA is to prevent federal-court interference with the assessment and collection of state

---

[2] (...continued)

discrimination because it would have impeded the County's collection of taxes; Cook County treasurer was a party); *RTC Commercial Assets Trust 1995-NP3-1 v. Phoenix Bond & Indem. Co.*, 169 F.3d 448, 454-56 (7th Cir. 1999) (TIA barred a claim for judicial declaration that a tax certificate purchased by a private party was invalid because it would have required the municipality to refund the proceeds of the tax-lien sale; Cook County was a party); *Blangeres v. Burlington N., Inc.*, 872 F.2d 327, 328 (9th Cir. 1989) (TIA barred a claim against private employers seeking to prevent their disclosure of employees' wage information to state tax authorities because it would have impeded the State's collection of income taxes; Idaho and Montana taxing authorities were parties); *Sipe v. Amerada Hess Corp.*, 689 F.2d 396, 403-04 (3d Cir. 1982) (TIA bars suit for equitable remedy against private employers' deduction of unemployment taxes from employees' wages because it would have impeded the State's receipt of those taxes; state unemployment compensation agency was a party).

and local tax revenue. *See Hibbs v. Winn*, 542 U.S. 88, 105-06 (2004); *Rosewell v. LaSalle Nat'l Bank*, 450 U.S. 503, 527-28 (1981); *Scott Air Force Base Props. v. Cnty. of St. Clair*, 548 F.3d 516, 520 (7th Cir. 2008); *Levy v. Pappas*, 510 F.3d 755, 761-62 (7th Cir. 2007). My colleagues have explained the TIA's important role in preserving the federal-state balance; the perils of federal-court interference with state and local tax administration; and the preference for a "crisp" rule for applying the TIA's jurisdictional bar to federal suits seeking equitable remedies against state and local tax measures. Majority Op. at 3-7. On these points I agree. Under the TIA's jurisdictional rule and the background prudential doctrine of comity, suits for equitable relief against state tax assessment and collection belong in state court. *See Levin v. Commerce Energy, Inc.*, 130 S. Ct. 2323, 2330-33 (2010). To the extent we can discern a clear, simple rule for applying the TIA's jurisdictional bar, we should. Complex and discretion-expanding multi-factor tests should be avoided where possible, especially on matters of jurisdiction, for all the reasons compellingly explained in the en banc opinion.

Nothing in the panel opinion undermined these principles. We held that the TIA does not apply because the 3% casino surcharge is more like a license fee than a tax, and a constructive trust on the money received by the racetracks would not interfere with the assessment or collection of any state revenue. In the plain language of the TIA, the district court is not being asked to "enjoin, suspend or restrain the assessment, levy or collection of any tax under State law." 28 U.S.C. § 1341. The

en banc rehearing has not altered the applicable legal principles, shed new light on the facts, or shaken my confidence in our original conclusion. The TIA does not apply here.

The en banc opinion divides up the universe of governmental exactions into three categories: fines, fees, and taxes. *See* Majority Op. at 9-13. The casino surcharge is not a fine, so we must decide whether it is more like a "fee" or a "tax." "The question whether something is a 'tax' or not for purposes of the TIA is ultimately one of federal law, even though we consult state law to understand exactly what a particular charge is." *RTC Commercial*, 169 F.3d at 457 (citing *Reconstr. Fin. Corp. v. Beaver Cnty., Pa.*, 328 U.S. 204, 207-10 (1946)). "The most common formula for classifying exactions under the Tax Injunction Act [is to] ask[] whether the payment is a tax to raise general revenue or is a fee incident to regulation." *Trailer Marine Transp. Corp. v. Rivera Vazquez*, 977 F.2d 1, 5 (1st Cir. 1992). This "formula" is drawn from an influential First Circuit opinion by then-Judge Breyer distinguishing for TIA purposes between revenue-raising tax measures, which are covered by the jurisdictional bar, and regulatory fees, which are not. *See San Juan Cellular Tel. Co. v. Pub. Serv. Comm'n of Puerto Rico*, 967 F.2d 683 (1st Cir. 1992). Following this lead, most courts look to the structure and purpose of the charge at issue to determine whether it counts as a tax for purposes of the TIA. *See Hill v. Kemp*, 478 F.3d 1236, 1244-48 (10th Cir. 2007); *Folio v. City of Clarksburg*, 134 F.3d 1211, 1217 (4th Cir. 1998); *Hager v. City of W. Peoria*, 84 F.3d 865, 870-71 (7th Cir. 1996); *Bidart Bros. v. Calif.*

*Apple Comm'n*, 73 F.3d 925, 930-33 (9th Cir. 1996); *Trailer Marine*, 977 F.2d at 5-6; *San Juan Cellular*, 967 F.2d at 684-86; *Wright v. McClain*, 835 F.2d 143, 144-45 (6th Cir. 1987).

Moreover, the Supreme Court has held that the primary object of the TIA is to protect the flow of state and local revenue from federal-court interference, *see Hibbs*, 542 U.S. at 106; *Grace Brethren Church*, 457 U.S. at 410-11, and this also explains why the cases tend to focus on whether the purpose of the challenged governmental exaction is regulatory or general-revenue-raising, *see Hill*, 478 F.3d at 1244-45 (noting that the "primary purpose of the special license plate scheme is revenue rather than regulation and thus it qualifies as a tax"); *Folio*, 134 F.3d at 1217 (distinguishing between "broader-based taxes that sustain the essential flow of revenue to state (or local) government and fees that are connected to some regulatory scheme" (internal quotation marks omitted)); *Hager*, 84 F.3d at 870-71 (drawing the same distinction between general-revenue-raising and regulatory purposes); *Bidart Bros.*, 73 F.3d at 930-33 (same); *Trailer Marine*, 977 F.2d at 5-6 (same); *San Juan Cellular*, 967 F.2d at 684-86 (same); *Schneider Transp., Inc. v. Cattanach*, 657 F.2d 128, 132 (7th Cir. 1981) (same). Finally, the form of relief requested is an important part of the inquiry. "[I]f the relief sought would diminish or encumber state tax revenue, then the Act bars federal jurisdiction over claims seeking such relief." *Scott Air Force Base*, 548 F.3d at 520 (citing *Levy*, 510 F.3d at 762); *see also Trailer Marine*, 977 F.2d at 5-6.

For the en banc court, the only payments that count as "fees" are those that "compensate for a service that the

state provides to the persons or firms on whom or on which the exaction falls" or those that "compensate the state for costs imposed on it by those persons or firms, other than costs of providing a service to them." Majority Op. at 10. This includes "[f]ees for products" (like electricity from a public utility) and "bona fide user fees" (like toll-road payments). *Id.* at 13. This definition corresponds to one that we and other circuits have used to identify a "classic" or "paradigmatic" fee, which courts generally agree is not covered by the TIA's jurisdictional bar. *See Hill*, 478 F.3d at 1245; *Hager*, 84 F.3d at 870-71; *San Juan Cellular*, 967 F.2d at 685. But it does not follow (and the cases do not hold) that unless a governmental charge is a "fee" under this "classic" or "paradigmatic" definition, then it must be a tax. That's what the en banc court has concluded. Clear classification lines are helpful, for all the reasons my colleagues have noted, but this kind of line-drawing shifts the focus away from the core "state-revenue-protective moorings" of the TIA. *Hibbs*, 542 U.S. at 106.

Some regulatory assessments do not fit the classic definition of a fee, but they don't have the characteristics of a tax, either. Government-mandated payments come in many types and can be implicated in federal litigation in a variety of ways. The TIA does not block federal jurisdiction over *all* suits touching on *any* payment to state or local government; it withdraws federal jurisdiction over suits seeking equitable remedies against the assessment and collection of state and local *taxes*. This directs our focus to whether the suit challenges a law that serves a general-revenue-raising function and

whether "the relief sought 'would . . . operate[] to reduce the flow of state tax revenue' or would tie up 'rightful tax revenue.' " *Levy*, 510 F.3d at 762 (quoting *Hibbs*, 542 U.S. at 106, and *Rosewell*, 450 U.S. at 527-28). The casino surcharge at issue here is specifically structured so that it does *not* raise state tax revenue.

As I have explained, the 2006 and 2008 Racing Acts impose the 3% surcharge on the State's four highest-earning casinos—and only these four—as a "condition of licensure." 230 ILL. COMP. STAT. 10/7(a). A different section of the Riverboat Gambling Act levies taxes on all riverboat casinos, *id.* § 10/13; the money collected under these provisions is specifically referred to as "tax revenue" subject to appropriation by the Illinois General Assembly. This "tax revenue" is earmarked for the support of specific governmental functions (e.g., education, the criminal justice system) and is distributed to the counties in which the casinos are situated, to be used for those purposes. *Id.* § 10/13(b), (c-20), (d).

In contrast the 3% surcharge appears in the Riverboat Gambling Act's section on "Owners [sic] Licenses" and is never referred to as a "tax."[3] *Id.* § 10/7. The surcharge

---

[3] That the Racing Acts do not call the surcharge a "tax" is relevant but not dispositive. As the en banc court rightly notes, legislatures often avoid using the t-word, *see* Majority Op. at 14 (" 'Taxation' is unpopular these days, so taxing authorities avoid the term."), so the name given to the exaction may not deserve much weight. That the Illinois Supreme Court called the surcharge a "tax" doesn't advance the discussion either; the
(continued...)

is paid into the "Horse Racing Equity Trust Fund," which is established as a "non-appropriated trust fund held separate and apart from State moneys" for the sole benefit of the racetracks. *Id.* §§ 5/54.5(a) (2006), 5/54.75(a). The money is disbursed very quickly and directly to the beneficiary racetracks. *Id.* §§ 5/54.5(b) (2006), 5/54.75(b). The State holds the money in trust for the racetracks; it may not be transferred to the State's general revenue fund or otherwise commingled with public funds and may not be allocated to any state agency or program or used to pay any state cost or expense. 30 ILL. COMP. STAT. 105/8h(a). Illinois itself assumes no obligation to the racetracks; the statutory scheme does not establish an entitlement program or obligate the State to pay a subsidy to the racetracks. Instead, the State acts as a trustee for the mandated transfer payments from the casinos to the racetracks.

---

[3] (...continued)

state supreme court also repeatedly referred to it as a "surcharge" and a "fee." *See, e.g., Empress Casino Joliet Corp. v. Giannoulias*, 896 N.E.2d 277, 283-84, 285, 289-91 (2008). The state constitution's uniformity clause applies to taxes *and* fees, ILL. CONST. art. IX, § 2, and the state supreme court used the terms "tax," "fee," and "surcharge" interchangeably throughout its opinion in *Giannoulias*. The Illinois General Assembly has plenary authority to enact the Racing Acts, but whether it invoked its police power or its tax power in adopting the Acts has some bearing on how the surcharge should be classified. The General Assembly structured the surcharge as a "condition of licensure," amending the provision of the Riverboat Gambling Act that pertains to gaming licenses—regulatory requirements that are tied to the State's police power. *See* 230 ILL. COMP. STAT. 10/2(b).

In short, the 3% casino surcharge is an off-budget regulatory device for relieving the competitive pressures exerted by riverboat gambling on the horse-racing tracks. I agree with my colleagues that the surcharge is not a "classic" regulatory fee; it does not compensate the State for services it provides to the casinos or otherwise defray the costs of the State's gaming regulatory apparatus. But that doesn't mean it's a tax. The surcharge does not raise revenue for the State or for any state program; its purpose is regulatory. To the extent the surcharge can be categorized at all, it might appropriately be called a "compensation charge," which is how we characterized it in *Kathrein v. City of Evanston*, 636 F.3d 906, 911 (7th Cir. 2011), a decision issued shortly after the release of the panel opinion in this case and now criticized by the en banc court. *See* Majority Op. at 13-14. *Kathrein* surveyed the TIA caselaw and identified several types of payments to state and local governments that although not prototypical "fees," are not properly classified as "taxes" for purposes of the TIA. 636 F.3d at 911-12. One of the "non-tax" payments identified in *Kathrein* was a "compensation charge"—a charge "imposed upon those who cause a negative externality, and its proceeds are used to compensate those affected by the externality." *Id.* at 911.

*Kathrein* cited the First Circuit's decision in *Trailer Marine* as an example of this kind of charge—not a classic "fee" but not a "tax," either. *Id. Trailer Marine* involved a dormant Commerce Clause challenge to a special registration fee imposed on "transitory" trailers entering Puerto Rican ports before permitting the trailers to be hitched to tractors for delivery of the transported goods

within Puerto Rico. The fee was paid into a dedicated fund that provided no-fault compensation to persons injured in motor-vehicle accidents. The court began its analysis by noting that *San Juan Cellular*'s regulatory fee/revenue-raising tax distinction "does not provide much help in this case." *Trailer Marine*, 977 F.2d at 5. This was because the purpose of the payment "is neither to raise general revenue for Puerto Rico nor to regulate conduct in the usual sense of that term," but instead was incidental to a "social welfare program and tort reform law." *Id.* Noting that "the legislature does not call the measure a tax and the money is collected largely as dedicated transfer payments for the beneficiaries" of the accident-compensation fund, the court held that the registration fee "should not be treated as a tax for purposes of the . . . Tax Injunction Act[]." *Id.* at 5-6. Although it was a "close issue," the court said it was "at least confident that allowing an injunction suit to be maintained poses no threat to the central stream of tax revenue relied on by Puerto Rico." *Id.* at 6.

The same is true here—even more so, in fact. Allowing this RICO suit to proceed will not pose any threat to tax revenue relied on by Illinois. The State's coffers will not be depleted if the casinos prevail. Contrary to my colleagues' suggestion, the casino surcharge is not analogous to a "sin tax" or other forms of taxation paid into special-purpose funds, whether of the "lock box" variety or not. *See* Majority Op. at 8, 12-15. The comparison to Social Security taxes and taxes levied to support agricultural subsidies is inapt. *See id.* at 13-14. The Racing Acts do not create an entitlement program

or even a traditional state subsidy. As I have noted, Illinois has not obligated itself to pay benefits to the racetracks and then enacted a tax as a source of revenue for its racetrack-support program. Nor are the payments made to the racetracks properly characterized as "earmarks," as my colleagues imply, *id.* at 12-15; the Horse Racing Fund is specifically designated as a "non-appropriated trust fund." The 3% surcharge is not a tax levied to fund a state spending program established for the benefit of the racetracks. To the contrary, as this subsidy program is structured, the casinos must share a portion of their wealth with the racetracks quite directly, with the State simply serving as an agent for receipt and disbursement of "dedicated transfer payments for the beneficiaries." *Trailer Marine*, 977 F.2d at 5.

For these reasons, I cannot join the en banc opinion. Needless to say, I take no position on the merits of the casinos' case—or for that matter, on my colleagues' extended discussion of the policy justifications for requiring rich casinos to share their profits with struggling horse-racing tracks. *See* Majority Op. at 16-19. These matters are not before the court. We have only a jurisdictional question, and on that question I remain where I was when this case was decided by the panel: The TIA's jurisdictional bar does not apply. A constructive trust on the racetracks' private escrow will not "freeze the state's tax moneys," as my colleagues have concluded.[4] *See id.* at 24. The casino surcharge is not

_____

[4] My colleagues have suggested that our decision in *Schneider Transport* is "indistinguishable from the present case," Majority

(continued...)

structured as a tax, and a constructive trust on the race-tracks' private escrow as a remedy for the alleged RICO violations will not interfere with the assessment or collection of any state revenue. I respectfully dissent.

---

[4] (...continued)

Op. at 12 (citing *Schneider Transp., Inc. v. Cattanach*, 657 F.2d 128, 132 (7th Cir. 1981)), but I disagree. *Schneider Transport* was a suit by a trucking company against the Wisconsin Secretary of Transportation seeking an injunction against the imposition of vehicle-registration fees on its fleet of trucks. 657 F.2d at 130-32. Truck-registration fees were deposited into the state's transportation fund and used for general transportation purposes, "including highway construction." *Id.* at 132. We concluded that the fee was a tax for purposes of the TIA because it was "imposed for revenue-raising purposes, a characteristic of any tax." *Id.* An injunction against the collection of the registration fee would have depleted the state transportation fund, which paid for highway construction and other state transportation needs. Here, in contrast, an injunction against the racetracks' private escrow would have no effect on the public fisc.

---